UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHAEL STEVEN RATLEY,

                    Plaintiff,

v.

                                        Case No. 3:21-cv-598-MMH-LLL

MARK INCH, et al.,

                    Defendants.

_____

# ORDER

## I. Status

Plaintiff Michael Steven Ratley, an inmate in the custody of the Florida

Department of Corrections (FDOC), initiated this action on June 14, 2021, by

filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint

(AC; Doc. 28) with exhibits (Doc. 28-1) on October 12, 2021.[1] In the AC, Ratley

asserts claims pursuant to 42 U.S.C. § 1983 against the following Defendants:

(1) Mark Inch, the FDOC Secretary; (2) Palmer, FDOC Region 2 Director; (3)

Glenn Young, Hamilton Correctional Institution Annex (HCIA) Warden; (4)

Gerald Stewart, HCIA Assistant Warden; (5) Sergeant E. Burkette; (6)

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the
document page numbers assigned by the Court's electronic docketing system.

Centurion Health (Centurion); (7) Dr. Leslie Colombani,[2] M.D., HCIA Chief Health Officer (CHO); (8) Nurse Ira Lee; (9) Dr. Richard Laubaugh, M.D., orthopedic surgeon and CHO at Taylor Correctional Institution; and (10) Dr. Jason Brenes-Catinchi, M.D., Central Florida Reception Center (CFRC) Medical Director. He alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when Defendant Burkette assaulted him on September 16, 2019; Defendants Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh denied him proper medical care following the assault; and Defendants Inch, Palmer, Stewart, and Young failed to remedy the mistreatment related to Burkette's assault and Defendants Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh's provision of inadequate medical care. As relief, he seeks monetary damages. He also asks that the Court direct the FDOC to train its staff and provide him proper medical care.

This matter is before the Court on Defendants Inch, Palmer, Stewart, and Young's Motion to Dismiss (FDOC Motion; Doc. 56) and Defendants Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh's Motion to Dismiss (Medical Motion; Doc. 57). The Court advised Ratley that granting a motion to dismiss would be an adjudication of the case that could foreclose

---

[2] The Court will direct the Clerk to correct the docket to reflect the proper spelling of Dr. Colombani's surname.

subsequent litigation on the matter and gave him an opportunity to respond. See Order (Doc. 5). Ratley filed responses in opposition to the Motions. See Response to Defendants' Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh's Motion to Dismiss (Response; Doc. 61); Response to Defendants Inch, Palmer, Stewart, and Young's Motion to Dismiss (Response II; Doc. 60). Defendants' Motions are ripe for review.

## II. Plaintiff's Allegations[3]

As to the specific underlying facts supporting his Eighth Amendment claims, Ratley asserts that, on September 16, 2019, two inmates hit him on the back of his head, and when he awoke from unconsciousness, Sergeant Burkette stomped and kicked him. AC at 7, 13. According to Ratley, on September 18th, he showed his right shoulder and arm injuries to Ms. Troy (a library supervisor), who immediately sent Ratley to the medical clinic where he saw Defendant Lee, a nurse. Id. at 14-15. He states that Lee ordered x-rays and

---

[3] The AC is the operative pleading. In considering a motion to dismiss, the Court must accept all factual allegations in the Amended Complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Miljkovic v. Shafritz and Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015) (quotations and citations omitted). As such, the recited facts are drawn from the AC and may differ from those that ultimately can be proved. Additionally, because this matter is before the Court on motions to dismiss filed by Defendants Centurion, Lee, Colombani, Brenes-Catinchi, Laubaugh, Inch, Palmer, Stewart, and Young, the Court's recitation of the facts will focus on Ratley's allegations as to these Defendants.

gave him Ibuprofen and a 45-day restricted-activity pass. Id. at 7, 15. He maintains that he was told it looked like a torn bicep. Id. at 15. Ratley asserts that on September 20th, he declared a second medical emergency, and saw "the night nurse" who contacted Lee. Id. at 16. He states that Lee authorized a Solu-Medrol (steroid shot for pain and swelling), Ibuprofen, and Tylenol packs for pain. Id. at 8, 16.

Ratley avers that when he sent "multiple emails" to his sister (Brandy Parrish) about the "extreme pain," she called the medical staff on September 22nd to ask for a "welfare check." Id. at 16. That same day, officers escorted him to the medical room, where Nurse Whitmore gave him Tylenol packs and told him "to stop having his family call" because "nothing else" could be done. Id. According to Ratley, on September 23rd, he tried to declare a medical emergency while housed in confinement, and the confinement staff notified the nurse who came to his cell, denied his medical emergency, and told him that the medical staff was aware of the issue and all medical remedies had been exhausted. Id. at 16-17. He avers that Defendant Colombani saw him on September 24th in the medical clinic and issued more Ibuprofen and a right-arm sling. Id. at 17; Doc. 28-1 at 4. He maintains that the medical staff denied his requests for "stronger medication" or a transfer to an outside hospital. Id. at 17.

4

According to Ratley, a technician took an x-ray of Ratley's right shoulder on September 25th, and the results showed "markedly comminuted fracture displacement of the humeral head/neck" with "markedly displaced greater tuberosity with oblique fracture through the proximal humerus." Id. at 17; Doc. 28-1 at 3, Radiology Report (finding "markedly comminuted fracture dislocation"), dated September 25, 2019. He states that the technician informed the confinement staff to keep Ratley in a holding cell until she could contact the medical staff for further instructions. AC at 17. He maintains that he signed a consultation form for a transfer to the Reception and Medical Center (RMC) where an orthopedic surgeon would consult with him. Id. at 17-18. Ratley states that he tried to declare a medical emergency, however, he was advised he had exhausted "all medical options" until he saw the orthopedic surgeon. Id. at 8, 18. He asserts that when the staff returned him to general population on September 26th, he declared a medical emergency and saw Nurses Whitmore, Booth, and Reise who advised him that nothing else could be done until the consultation request to see the orthopedic surgeon was approved. Id. at 18. He avers that the nurses advised him to stop complaining to his mother and sister and "man up" while he waited for surgery. Id. He notes that an ROI (release of information) was on file for his mother and sister. Id.

5

Ratley maintains that the next day (September 27th), he saw Drs. Winters and Ryan for an orthopedic consultation at RMC. Id. After two additional x-rays, they told him he needed emergency surgery to repair the right-shoulder damage. Id. He avers that the surgery had to be rescheduled because "the proper surgical parts were not on site." Id. at 18-19; Doc. 28-1 at 5 (complaining in a grievance to the FDOC Secretary about a 13-day delay and that the surgeon did not have "enough parts" to complete the surgery, so the FDOC returned him to HCIA's general population). Ratley explains that he updated his sister at visitation on September 28th, and the next day, she filed a complaint on the FDOC website about the lack of adequate medical care. AC at 19-20.

Next, Ratley avers that he declared another medical emergency on September 30th, and Nurses Reise and Sturdivant saw him in the medical clinic, and called Dr. Colombani who ordered three shots (one for pain, and two for swelling and bruising). Id. at 20. Ratley maintains that he asked the medical staff if he could remove his shirt, so they could see the extent of his injury (which included a more recent injury caused by his cellmate who stepped on Ratley's broken arm while getting off his bunk). Id. He states that "this was the first and only time [he] was allowed to show [his] full injury to medical staff." Id. He avers that the right-shoulder surgery request was upgraded from

6

urgent to emergent, and he was advised he could no longer take Ibuprofen, but the security staff could provide Tylenol packs. Id. at 21.

According to Ratley, his sister was told on October 3rd that his surgery was approved, and she called the medical staff on October 9th asking for a "wellness check." Id. at 22. He maintains that his sister emailed Palmer and the FDOC central office, and he submitted grievances about the inadequate medical care. Id. at 22-23. Ratley states that, on October 16th, he was seen at sick call for an elevated pulse and high blood pressure due to the extreme pain, and again was given Tylenol packs. Id. at 23. He states that, on October 21st, his sister spoke to Ms. Gaylord, who advised that Ratley's surgery was approved. Id.

Next, Ratley asserts that, on October 23rd, the FDOC transferred him to CFRC for surgery at the Orlando Outpatient Surgical Center. Id. at 24. He states that the CFRC intake medical staff gave him medication to lower his pulse. Id. According to Ratley, the FDOC transported him to the surgical center on October 24th, however, his surgery was canceled because the elevator was broken. Id.; Doc. 28-1 at 13. He states that the FDOC returned him to CFRC, where he saw an "APRN and MD" who advised him that he "would be held" there until his surgery. Id. at 24. He complains that he "was still not given any pain medication." Id. He asserts that H. Kirkland, a CFRC consultation

7

coordinator, informed him on October 29th that the FDOC would notify him about rescheduling his surgery. Id. Ratley maintains that the medical staff gave him Naproxen as a pain reliever on October 30th. Id. According to Ratley, he went to sick call on November 1st, and a nurse told him he "would not receive any stronger medication regardless of [his] pain level." Id. at 24-25.

Ratley asserts that he ultimately had right-shoulder open reduction internal fixation (ORIF) surgery on November 4th, and was returned to CFRC where the staff released him to general population the following morning, despite his requests to stay in the infirmary. Id. at 25. According to Ratley, he had a follow-up visit with Valdez (a physician's assistant) on November 12th, was given Ibuprofen and Tylenol, and transferred to RMC on November 14th for follow-up care. Id. He states that, on November 15th, he saw Drs. Winters and Ryan, who removed the stitches and ordered Naproxen, "which was never filled." Id. at 26. He maintains that the FDOC transferred him to HCIA on December 13, 2019, and placed him in confinement due to an Office of the Inspector General (OIG) investigation. Id. at 27. He describes an environment where he saw Burkette and one of the inmates who had attacked him. Id. Ratley states that he started right-shoulder physical therapy on January 2, 2020. Id. at 29.

He avers that he "began to complain" about left-shoulder pain to the physical therapist on January 10, 2020, id. at 29, saw a primary care physician about the pain on March 12th, was given injections for pain and swelling, and advised to do therapy in the dormitory to increase range of motion, id. at 30. Ratley asserts that Dr. Laubaugh, an orthopedic surgeon, failed to order an x-ray that day. Id. at 9-10. He alleges that, on April 10th, a nurse saw him in sick call regarding bilateral shoulder pain and ordered an x-ray of the left shoulder. Id. at 10, 30. He maintains that the x-ray showed "impacted anterior glenohumeral joint dislocation," for which he had left-shoulder ORIF surgery on June 5th. Id.

According to Ratley, he had an orthopedic follow-up visit on June 19th, and the x-ray showed "unchanged impacted anterior glenohumeral joint dislocation," for which the orthopedic surgeon referred him to another surgeon for a double reversal total shoulder replacement due to a Hills-Sachs Impaction Fracture. Id.; Doc. 28-1 at 32, Radiology Report, dated June 19, 2020. He maintains that he saw a primary care physician about bilateral shoulder pain on July 14th, and was given Ibuprofen. AC at 30. Ratley states that he complained about right-shoulder pain at sick call on July 23rd, and days later, he asked for an update about his upcoming left-shoulder surgery. Id. He avers that he saw a primary care physician about bilateral shoulder pain on July

28th, and "[n]othing was done." Id. at 31. Ratley also states that he filed grievances and also complained about bilateral shoulder pain on August 13th and right-shoulder pain on August 26th at his sick-call visits. Id. He avers that, on August 31st, he complained to a primary care physician about his chronic right-shoulder pain, and was told that surgery for his left shoulder was approved. Id. He states that he continued to submit grievances related to his shoulder pain. Id. at 31-34.

Next, Ratley asserts that he complained about right-shoulder pain at sick-call visits on September 11, 17, 2020; October 2, 2020; January 26, 2021; March 21, 2021; and May 17, 25, 26, 2021, and bilateral shoulder pain at sick-call visits on October 10, 2020, and December 17, 2020. Id. He states that, on September 23, 2020, he saw a primary care physician, who informed him that the chronic right-shoulder pain was normal because of the hardware and previous injury. Id. at 32. Ratley avers that a primary care physician ordered pain target point injections on October 23, 2020, and an x-ray showed that the bones had healed, and hardware appeared normal. Id. at 33. He states that he received pain target point injections on November 6, 2020. Id. According to Ratley, a July 19, 2021 right-shoulder x-ray showed "mild OA [osteoarthritis] with stable postoperative changes with healed fracture." Id. at 34.

Additionally, as to his left-shoulder pain, Ratley states that, on September 15, 2020, an orthopedic surgeon at Orlando Regional Medical Center told him that he needed a double reversal total shoulder replacement to correct the Hill-Sachs Impaction Fracture. <u>Id.</u> at 32. He states that an orthopedic surgeon performed the double reversal total left-shoulder replacement on December 28, 2020. <u>Id.</u> at 33. He avers that he complained at sick call in February 2021 about the lack of a follow-up visit with an orthopedic surgeon. <u>Id.</u>

Ratley maintains that he suffered unnecessary delays related to the provision of medical care. He states that he suffered with left-shoulder pain from January 10, 2020 (when he first complained to a physical therapist) to December 28, 2020, when an orthopedic surgeon performed a double reversal total shoulder replacement. <u>Id.</u> at 10, 33. He specifically calculates the delay as lasting 193 days (from June 19, 2020, when an orthopedic surgeon referred him to another orthopedic surgeon for additional left-shoulder surgery), and 478 days (from September 16, 2019, when Burkette assaulted him). <u>Id.</u> at 10, 33. He also states that he suffered with right-shoulder pain from September 16, 2019, until November 4, 2019, when he had ORIF surgery. <u>Id.</u> at 10.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.'" Campbell v. Air Jamaica Ltd., 760 F.3d 1165, 1168-69 (11th Cir. 2014) (quoting GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted), overruled in part on other grounds as recognized in Randall, 610 F.3d at 709).

## IV. Summary of the Arguments

Defendants Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh request dismissal of Ratley's Eighth Amendment claims against them. See Medical Motion at 8-24. They assert that (1) Ratley's allegations are insufficient to state plausible medical deliberate indifference claims against them, id. at 9-16; (2) the Eleventh Amendment bars Ratley's claims for monetary damages against them in their official capacities, id. at 16-17; (3) Centurion cannot be held liable under 42 U.S.C. § 1983, id. at 17-20; (4) to the extent Ratley intends to pursue a medical malpractice or negligence claim, he has failed to comply with the pre-suit requirements of Florida's Medical Malpractice Act, id. at 20-22; and (5) Centurion is immune from suit as to any claim of medical negligence or malpractice, id. at 22-24. Additionally, Defendants Inch, Palmer, Stewart, and Young request dismissal of Ratley's Eighth Amendment claims against them. FDOC Motion at 5-13. They assert that (1) Ratley's allegations are insufficient to state plausible deliberate indifference claims against them, id. at 5-12, and (2) the Eleventh Amendment bars Ratley's claims for monetary damages against them in their official capacities, id. at 12. In his Responses, Ratley contends that he states plausible Eighth Amendment claims against Defendants. See generally Response; Response II.

14

## V. Discussion

### A. Eighth Amendment Deliberate Indifference Claims Against Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh

Ratley asserts that Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh violated his Eighth Amendment right when they were deliberately indifferent to his serious medical needs, i.e. shoulder ailments. In his AC, Ratley provides a detailed chronology of his medical complaints and sick-call visits, which he initiated as a result of injuries he allegedly sustained on September 16, 2019, when Sergeant Burkette kicked him as he awoke from unconsciousness. Ratley also chronicles the campaign he, along with his family members, executed to seek timely, adequate medical treatment for his injuries. Defendants contend that their conduct does not amount to deliberate indifference. Medical Motion at 9-16. They assert that they provided "ongoing care," and that Ratley's assertions related to "the type of treatment" (providing medications as opposed to surgeries) or "the location of any such treatment" (within the institution as opposed to an outside medical facility) do not rise to the level of deliberate indifference. Id. at 11.

In his Response to the Medical Motion, Ratley reasserts the allegations he presents in his AC, and cites to exhibits that he attached to his AC. He states that he "is not saying that no medical care was given, but that the level

15

of care given was so disproportionate to the injury and the time for the proper treatment to be given was so far outside of any minimum level of care that i[t] did not meet the constitutional minimum." Response at 2-3. He maintains that Defendants failed to provide adequate care in a timely manner when they were aware of the seriousness of his shoulder injuries, and that the delays he endured contributed to additional suffering. Id. at 3-20.

Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct. Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing Farmer, 511 U.S. at 834); Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). The Eleventh Circuit has explained:

Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id.[4] The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.

Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Oliver v. Fuhrman, 739 F. App'x 968, 969-70 (11th Cir. 2018).[5] "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" Keohane v. Fla.

---

[4] Chandler, 379 F.3d at 1289.

[5] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Dep't of Corr. Sec'y, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). The Eleventh Circuit has explained:

> "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). **To meet the first prong**, the plaintiff must demonstrate an "objectively serious medical need"—i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotations omitted). **To satisfy the second**, subjective prong, the plaintiff must prove that the prison officials "acted with deliberate indifference to [his serious medical] need." Harper v. Lawrence Cty., 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted). "To establish deliberate indifference," a plaintiff must demonstrate that the prison officials "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence." Id. (quotation omitted).[6] An inmate-plaintiff bears the burden to

---

[6] The Eleventh Circuit has recognized "a tension within [its] precedent regarding the minimum standard for culpability under the deliberate-indifference standard." Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 n.2 (11th Cir.

18

establish both prongs. <u>Goebert v. Lee Cty.</u>, 510 F.3d
1312, 1326 (11th Cir. 2007).

<u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 (11th Cir. 2020)

(footnote omitted; emphasis added). For medical treatment to rise to the level

of a constitutional violation, the care must be "'so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness.'" <u>Hoffer</u>, 973 F.3d at 1271 (quoting <u>Harris v. Thigpen</u>,

941 F.2d 1495, 1505 (11th Cir. 1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d

1030, 1033 (11th Cir. 1989) (stating "[g]rossly incompetent or inadequate care

can constitute deliberate indifference …, as can a doctor's decision to take an

easier and less efficacious course of treatment" or fail to respond to a known

medical problem).

However, the law is well settled that the Constitution is not implicated

by the negligent acts of corrections officials and medical personnel. <u>Daniels v.</u>

<u>Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348

(1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause,

whether procedural or substantive, are just not triggered by lack of due care

2021). The court stated that the "competing articulations –'gross' vs. 'mere'
negligence"– may be "a distinction without a difference" because "no matter how
serious the negligence, conduct that can't fairly be characterized as <u>reckless</u> won't
meet the Supreme Court's standard." <u>Id.</u>; <u>Patel v. Lanier Cnty. Ga.</u>, 969 F.3d 1173,
1188 n.10 (11th Cir. 2020).

by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham, 654 F.3d at 1176 (quotation marks and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted). In sum, the Eleventh Circuit has stated:

> A prisoner bringing a deliberate-indifference claim has a steep hill to climb. We have held, for instance, that the Constitution doesn't require that the medical care provided to prisoners be "perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quotation omitted).[7] Rather, "[m]edical treatment violates the [E]ighth [A]mendment only

---

[7] Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991).

when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. at 1505 (quotation omitted). We have also emphasized—as have our sister circuits—that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." Id.; accord, e.g., Lamb v. Norwood, 899 F.3d 1159, 1162 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."); Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc) ("[The Eighth Amendment] does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing.").

Keohane, 952 F.3d at 1266.

Despite this high threshold, the Eleventh Circuit has recognized that, even when a prisoner receives some medical care, a plaintiff can state a claim for deliberate indifference if he alleges the care he received was "so cursory as to amount to no treatment at all," was grossly inadequate, or was guided by a "decision to take an easier but less efficacious course of treatment." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Viewing the allegations in the AC in the light most favorable to Ratley, he describes an environment where the medical attention he received from Defendants was disproportionate to the severity of the injuries, and that he endured unnecessary delays that

ultimately worsened his medical conditions. See generally AC. Accepting the allegations in the AC as true, as the Court must, and drawing all reasonable inferences in Ratley's favor, his well-pled assertions nudge his Eighth Amendment claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Thus, his assertions relating to Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh's provision of medical care state plausible Eighth Amendment deliberate indifference claims against them. As such, the Medical Motion is due to be denied as to Ratley's Eighth Amendment deliberate indifference claims against these Defendants.

## B. Eleventh Amendment Immunity

Defendants Lee, Colombani, Brenes-Catinchi, Laubaugh, Inch, Palmer, Stewart, and Young assert that, to the extent they are sued in their official capacities for monetary damages, they are entitled to Eleventh Amendment immunity. See FDOC Motion at 12; Medical Motion at 16-17. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well-settled that, in the absence of consent, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh

Amendment." <u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986) (quotation omitted).

The Eleventh Amendment also prohibits suits against state officials where the

state is the real party in interest, such that a plaintiff could not sue to have a

state officer pay funds directly from the state treasury for the wrongful acts of

the state. <u>Summit Med. Assocs., P.C. v. Pryor</u>, 180 F.3d 1326, 1336 (11th Cir.

1999).

In <u>Zatler v. Wainwright</u>, 802 F.2d 397, 400 (11th Cir. 1986) (per curiam),

the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. <u>Quern v. Jordan</u>, 440 U.S. 332, 340-45, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited waiver of sovereign immunity was not intended to encompass section 1983 suits for damages. <u>See</u> <u>Gamble</u>,[8] 779 F.2d at 1513-20.

Accordingly, in <u>Zatler</u>, the court found that the FDOC Secretary was immune

from suit in his official capacity. <u>Id.</u> Thus, insofar as Ratley may be seeking

monetary damages from Defendants in their official capacities, the Eleventh

Amendment bars suit. Therefore, the Motions are due to be granted to the

---

[8] <u>Gamble v. Fla. Dep't of Health & Rehab. Serv.</u>, 779 F.2d 1509 (11th Cir. 1986).

extent that Ratley requests monetary damages from Defendants in their official capacities.[9]

### C. Eighth Amendment Claims Against
### Defendants Inch, Palmer, Stewart, and Young

In the AC, Ratley asserts that Defendants Inch, Palmer, Stewart, and Young violated his Eighth Amendment right when he (along with his sister) notified Defendants about his health and safety concerns, and they failed to remedy the ongoing mistreatment. See generally AC. Defendants contend that Ratley fails to state plausible Eighth Amendment claims against them. See generally FDOC Motion. In his Response, Ratley maintains that Defendants were well aware of the mistreatment he endured stemming from Burkette's assault and the denial of medical care. See generally Response II.

As to supervisory liability, the Eleventh Circuit has stated:

> Supervisory officials are not vicariously liable under section 1983 for the unconstitutional acts of their subordinates. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). Plaintiff[] must instead allege that the supervisor, through his own actions, violated the Constitution. Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Ingram v. Kubik, 30 F.4th 1241, 1254 (11th Cir. 2022). A prisoner must assert

---

[9] A dismissal on the basis of Eleventh Amendment immunity is a dismissal for lack of jurisdiction and as such must be without prejudice. See Nichols v. Ala. State Bar, 815 F.3d 726, 733 (11th Cir. 2016).

facts showing either that a supervisor personally participated in the alleged constitutional violation or that there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation to state a claim against a supervising official. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999); Gaffney v. Warden, Taylor Corr. Inst., No. 20-13572, 2022 WL 18381, at *5 (11th Cir. Jan. 3, 2022) (per curiam) (stating supervisory liability "only occurs when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.").

The Court finds that Ratley alleges sufficient facts suggesting that Defendants were personally involved in, or otherwise causally connected to, the alleged violations of his federal statutory or constitutional rights. See AC at 8-9, 21-23, 26-27; see generally Doc. 28-1. As such, the FDOC Motion is due to be denied as to Ratley's Eighth Amendment claims against Defendants Inch, Palmer, Young, and Stewart.

### D. Eighth Amendment Claim Against Centurion

In the AC, Ratley asserts that Centurion, as the "medical services provider" that contracted with the FDOC, failed in its supervisory capacity to remedy the ongoing mistreatment and violated state law. AC at 7-10. Defendant Centurion maintains that Ratley fails to allege that Centurion had

a custom, policy, or practice that was the moving force behind a federal constitutional violation. Medical Motion at 19-20. In his Response, Ratley elaborates, stating that Centurion had a cost-savings plan that included delays and alternative treatment plans. Response at 9, 13, 18.

Centurion provides medical services to inmates within the state of Florida pursuant to a contract with the FDOC. Although Centurion is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state … is performed by a private entity, state action is present" for purposes of § 1983. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). Indeed,

> "when a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality" under section 1983. Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997). "[L]iability under § 1983 may not be based on the doctrine of respondeat superior." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011); see Denham v. Corizon Health, Inc., Case No. 6:13-cv-1425-Orl-40KRS, 2015 WL 3509294, at *3 n.1 (M.D. Fla. June 4, 2015) ("[W]hen a government function is performed by a private entity like Corizon, the private entity is treated as the functional

26

equivalent of the government for which it works.") (citation omitted), aff'd (11th Cir. Jan. 13, 2017).

Where a deliberate indifference medical claim is brought against an entity, such as Centurion, based upon its functional equivalence to a government entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig, 643 F.3d at 1310 (quoting Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); see Denno v. Sch. Bd. Of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the

directives of <u>Monell</u>, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." <u>Denno</u>, 218 F.3d at 1276 (citations omitted); <u>see</u> <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating <u>Monell</u> "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" <u>Grech</u>, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by

governmental policymakers. <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. <u>See</u> <u>Grech</u>, 335 F.3d at 1330; <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." <u>Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." <u>Sewell</u>, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). Because Centurion's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical care and services to inmates, Ratley must plead that an official policy or a custom or practice of Centurion was the

29

moving force behind Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh's alleged federal constitutional violations.

In the AC, Ratley states that Centurion contracted with the FDOC to provide healthcare within the prison system. AC at 7. He asserts that Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh "violated protocol" and the code of ethics when they failed to provide timely medical care. Id. at 7-10. However, Ratley has alleged no facts showing that Centurion itself violated his federal constitutional rights or caused a violation of his constitutional rights. Stated another way, Ratley has asserted no facts showing that a policy, custom, or practice of Centurion was the moving force behind any violation of his federal constitutional rights. Rather, Ratley provides a detailed factual chronology about how individual medical providers, such as Lee, Colombani, Brenes-Catinchi, and Laubaugh, willfully disregarded "established medical protocol" for what Ratley describes as injuries that needed urgent attention. Id. at 10. This is insufficient to state a claim against Centurion. As such, the Medical Motion is due to be granted to the extent that Ratley's Eighth Amendment claim against Centurion will be dismissed.[10]

---

[10] The Court need not address Centurion's assertion of sovereign immunity. See Medical Motion at 22-24.

## E. Florida's Pre-Suit Requirements
## for a Medical Malpractice Claim

In the AC, Ratley also asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. AC at 4. Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh contend that, to the extent Ratley is attempting to bring medical malpractice claims against them, the claims are barred because he failed to comply with Florida's pre-suit requirements. Medical Motion at 20-22. They urge the Court to dismiss the medical malpractice and/or negligence claims with prejudice. Id. at 21-22. In his Response, Ratley states that "he was unaware of Florida's Medical Malpractice Act and is now aware that failure to file a Notice of Intent 'is fatal to a malpractice claim.'" Response at 20 (citation omitted). He asserts that he "is now aware that he is no longer allowed to pursue any state tort remedies but wishes to continue to fight the ongoing constitutional violations he has endured at the hands of the defendant[]s." Id.

The Eleventh Circuit has persuasively stated:

> Florida law requires that[,] before filing any claim for personal injury or wrongful death arising from medical malpractice, the claimant conduct an investigation of the claim and send the defendant(s) a notice of intent to sue, along with a corroborating opinion by a medical expert. Fla. Stat. § 766.203(2) (2005). Attorneys must file with the claim a certificate of counsel, verifying that they have conducted a

31

reasonable investigation and that there is a basis for a good faith belief that medical negligence occurred. Fla. Stat. § 766.104 (2005). The Florida Supreme Court has made clear that these requirements are prerequisites to suit, but not jurisdictional. <u>Kukral v. Mekras</u>, 679 So.2d 278, 283 (Fla. 1996). . . .

Florida law mandates the dismissal of a claim for medical malpractice when the pre-suit requirements have not been fulfilled. Fla. Stat. § 766.206(2) (2005).

<u>Johnson v. McNeil</u>, 278 F. App'x 866, 871-72 (11th Cir. 2008).

Florida's statutory pre-suit investigation process requires a claimant to conduct a reasonable investigation to determine whether there are "grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." Fla. Stat. § 766.104(1); <u>see</u> Fla. Stat. § 766.203(2); <u>Weaver v. Myers</u>, 229 So.3d 1118, 1121 (Fla. 2017) ("[B]efore filing a medical negligence action in Florida, a claimant must satisfy statutory requirements, which include conducting a presuit investigation process to ascertain whether there are reasonable grounds to believe that the defendant medical provider was negligent, and that the negligence resulted in injury to the claimant."). The claimant must corroborate his claim of medical negligence with a verified written medical expert opinion, which must be furnished to each potential defendant with the notice of intent to initiate litigation. Fla. Stat. § 766.203(2). In accordance with Florida law, to the extent Ratley intends to bring a medical

malpractice claim against any Defendant, he was required to comply with the mandatory pre-suit requirements set forth in Chapter 766. Because he has not done so, the Medical Motion is due to be granted as to Ratley's medical malpractice claims. Thus, Ratley's claims will be dismissed without prejudice, and he may refile his state law claims in state court if the applicable law supports his ability to do so.[11]

In consideration of the foregoing, it is now

**ORDERED**:

1.     Defendants Inch, Palmer, Stewart, and Young's Motion to Dismiss (Doc. 56) is **GRANTED in part** as to Ratley's claims for monetary damages against Defendants in their official capacities. Otherwise, the Motion is **DENIED**.

2.     Defendants Centurion, Lee, Colombani, Brenes-Catinchi, and Laubaugh's Motion to Dismiss (Doc. 57) is **GRANTED in part** as to Ratley's (1) claims for monetary damages against Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh in their official capacities; (2) Eighth Amendment

---

[11] The statute of limitations for a medical malpractice claim is two years, see Fla. Stat. § 95.11(4)(b), while the statute of limitations for a negligence claim is four years, see Fla. Stat. § 95.11(3)(a). The Court expresses no opinion as to whether a state-law claim for medical malpractice or negligence would be barred by the applicable statute of limitations.

33

claim against Centurion; and (3) medical malpractice claims against Lee, Colombani, Brenes-Catinchi, and Laubaugh because Ratley failed to comply with Florida's pre-suit requirements. Otherwise, the Motion is **DENIED**.

3.     Defendants Dixon,[12] Palmer, Stewart, Young, Lee, Colombani, Brenes-Catinchi, and Laubaugh shall respond to the Amended Complaint **no later than July 20, 2022**. Upon the filing of Defendants' Answers, the Court, by separate Order, will set deadlines for discovery and the filing of dispositive motions.

4.     The Court **directs the Clerk** to terminate Centurion as a Defendant in the case, and make the appropriate entries on the docket to reflect the substitution of Ricky D. Dixon for Mark Inch, and the proper spelling of Dr. L. Colombani's surname.

     **DONE AND ORDERED** at Jacksonville, Florida, this 21st day of June, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

---

[12] Ratley sues Mark Inch in his official capacity as Secretary of the Florida Department of Corrections (FDOC), a position he no longer holds. Ricky D. Dixon is the current Secretary of the FDOC. Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ricky D. Dixon is substituted as the proper party Defendant as the FDOC Secretary with respect to the official-capacity claim.

Jax-1 5/31
c:
Michael Steven Ratley, FDOC #J39737
Counsel of Record