UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHAEL STEVEN RATLEY,

          Plaintiff,

vs.                               Case No. 3:21-cv-598-MMH-LLL

RICKEY D. DIXON, et al.,

          Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Michael Steven Ratley, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on June 14, 2021, by filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint (AC; Doc. 28) with exhibits (Doc. 28-1) on October 12, 2021.[1] In the AC, Ratley asserts claims pursuant to 42 U.S.C. § 1983. The following Defendants remain in the case: (1) Ricky D. Dixon, the FDOC Secretary; Palmer, FDOC Region 2 Director; (3) Glenn Young, Hamilton Correctional Institution Annex (HCIA) Warden; (4) Gerald Stewart, HCIA Assistant Warden; (5) Sergeant E. Burkett; (6) Dr. Leslie Colombani, M.D., HCIA Chief Health Officer (CHO); Nurse Ira

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

Lee; Dr. Richard Laubaugh, M.D., orthopedic surgeon and CHO at Taylor Correctional Institution; and Dr. Jason Brenes-Catinchi, M.D., Central Florida Reception Center (CFRC) Medical Director. Ratley alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when Defendant Burkett assaulted him on September 16, 2019; Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh denied him proper medical care following the assault; and Defendants Dixon, Palmer, Stewart, and Young failed to remedy the mistreatment related to the assault and the provision of inadequate medical care. As relief, Ratley seeks monetary damages. He also asks that the Court direct the FDOC to train its staff and provide him proper medical care.

This matter is before the Court on Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh's Motion for Summary Judgment (Motion; Doc. 113). They submitted exhibits in support of the Motion. See Docs. 113-1 through 113-8. They also submitted a Supplement to Motion for Summary Judgment (Supplement; Doc. 115). The Court advised Ratley of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 5); Summary Judgment Notice (Doc. 114). Ratley filed a response in opposition to the Motion. See

"Plaintiff's Declaration in Opposition to Defendant's Lee, Colombani, Brenes-Catinchi and Laubaugh's Motion for Summary Judgment" (Response; Doc. 116). He also submitted exhibits in support of the Response. See Docs. 116-1 through 116-45. Defendants filed a Reply in Support of Motion for Summary Judgment (Reply; Doc. 121). Defendants' Motion is ripe for review.

## II. Plaintiff's Allegations

As to the specific underlying facts supporting his Eighth Amendment claims, Ratley asserts that on September 16, 2019, two inmates hit him on the back of his head, and when he awoke from unconsciousness, Sergeant Burkett stomped and kicked him. AC at 7, 13. He alleges the following transpired after the assault. On September 18, 2019, Ratley showed his right shoulder and arm injuries to Ms. Troy, a library supervisor, who immediately sent Ratley to the medical clinic where he was seen by Defendant Lee, a nurse. Id. at 14-15. Lee ordered x-rays and gave Ratley ibuprofen and a 45-day restricted-activity pass. Id. at 7, 15. Ratley maintains he was told the injury looked like a torn bicep. Id. at 15. On September 20, 2019, Ratley declared a second medical emergency and saw "the night nurse" who contacted Lee. Id. at 16. Lee authorized a Solu-Medrol (steroid shot for pain and swelling), ibuprofen, and Tylenol packs for pain. Id. at 8, 16.

According to Ratley, he sent multiple e-mails to his sister, Brandy Parrish, about his extreme pain, and on September 22, 2019, Ms. Parrish called

3

medical staff to request a welfare check. Id. at 16. That same day, officers escorted Ratley to the medical room, where Nurse Whitmore gave him Tylenol packs and told him to stop having his family call because nothing else could be done. Id. On September 23, 2019, Ratley tried to declare a medical emergency while housed in confinement, and confinement staff notified the nurse who came to Ratley's cell, denied his medical emergency, and told him that the medical staff was aware of the issue and all medical remedies had been exhausted. Id. at 16-17. Defendant Dr. Colombani saw Ratley on September 24, 2019 in the clinic and gave him ibuprofen and a right-arm sling. Id. at 17; Doc. 28-1 at 4. Medical staff denied his requests for stronger medication or a transfer to an outside hospital. Id. at 17.

Thereafter, on September 25, 2019, a technician took an x-ray of Ratley's right shoulder, and the results revealed a markedly comminuted fracture displacement of the humeral head/neck with markedly displaced greater tuberosity with oblique fracture through the proximal humerus. Id. at 17; Doc. 28-1 at 3, Radiology Report (finding "markedly comminuted fracture dislocation"), dated September 25, 2019. The technician informed the confinement staff to keep Ratley in a holding cell until the technician could contact the medical staff for further instructions. AC at 17. Ratley signed a consultation form for a transfer to the Reception and Medical Center (RMC) for an orthopedic consultation with a surgeon. Id. at 17-18. He tried to declare

a medical emergency but was advised all medical options had been exhausted until he saw the orthopedic surgeon. Id. at 8, 18. When staff returned him to general population on September 26, 2019, Ratley declared a medical emergency and saw Nurses Whitmore, Booth, and Reise, who advised nothing more could be done until the consultation request to see the orthopedic surgeon was approved. Id. at 18. The nurses told him to stop complaining to his mother and sister and "man up" while he awaited surgery. Id. He notes there was "a release of information" (ROI) on file for his mother and sister. Id.

Ratley maintains that the next day, September 27, 2019, he saw Drs. Winters and Ryan at RMC for an orthopedic consultation. Id. After two additional x-rays, the doctors told Ratley he needed emergency surgery to repair the right shoulder. Id. The surgery had to be rescheduled because "the proper surgical parts were not on site." Id. at 18-19; Doc. 28-1 at 5 (complaining in a grievance to the FDOC Secretary about a 13-day delay and that the surgeon did not have "enough parts" to complete the surgery, so the FDOC returned him to HCIA's general population). During a visit on September 28, 2019, Ratley updated his sister, and the next day, his sister filed a complaint on the FDOC website about the lack of adequate medical care. AC at 19-20.

On September 30, 2109, Ratley declared another medical emergency, and Nurses Reise and Sturdivant saw him in the clinic, and called Dr. Colombani who ordered three shots (one for pain, and two for swelling and

bruising).  Id. at 20. Ratley asked medical staff if he could remove his shirt so that they could see the extent of his injury (which included a more recent injury caused by his cellmate who stepped on Ratley's broken arm while getting off his bunk. Id. He maintains, "this was the first and only time [he] was allowed to show [his] full injury to medical staff." Id. Ratley's right-shoulder surgery request was upgraded from urgent to emergent, and he was advised that the security staff could provide Tylenol packs, but he could no longer take ibuprofen. Id. at 21.

According to Ratley, on October 3, 2019, his sister was told that his surgery was approved, and she called the medical staff on October 9, 2019 asking for a "wellness check." Id. at 22. Ratley's sister emailed Palmer and the FDOC Central Office, and Ratley submitted grievances about the inadequate medical care. Id. at 22-23. On October 16, 2019, Ratley was seen at sick call for an elevated pulse and high blood pressure due to the extreme pain and was given Tylenol packs. Id. at 23. On October 21, 2019, Ratley's sister spoke to Ms. Gaylord, who advised that the surgery was approved. Id.

Next, on October 23, 2019, the FDOC transferred Ratley to CFRC for surgery at the Orlando Outpatient Surgical center. Id. at 24. The medical staff gave Ratley medication to lower his pulse. Id. The FDOC transported him to the surgical center, but the surgery was canceled because the elevator was broken. Id.; Doc. 28-1 at 13. The FDOC returned Ratley to CFRC, where he

6

saw an "APRN and MD" who advised him that he "would be held" there until his surgery. Id. at 24. He was not given any pain medication. Id. On October 29, 2019, H. Kirkland, a CFRC consultation coordinator, informed Ratley that the FDOC would notify him about rescheduling the surgery. Id. The medical staff gave him Naproxen, a pain reliever, on October 30, 2019. Id. On November 1, 2019, Ratley went to sick call, and a nurse told him he "would not receive any stronger medication regardless of [his] pain level." Id. at 24-25.

According to Ratley, he finally had right-shoulder open reduction internal fixation (ORIF) surgery on November 4, 2019, and was returned to CFRC where the staff released him to general population the following morning, despite his requests to stay in the infirmary. Id. at 25. Ratley had a follow-up visit with Valdez, a physician's assistant, on November 12, 2019, was given ibuprofen and Tylenol, and transferred to RMC on November 14, 2019, for follow-up care. Id. The next day, November 15, 2019, Ratley saw Drs. Winters and Ryan, who removed the stitches and ordered Naproxen, "which was never filled." Id. at 26. The FDOC transferred Ratley to HCIA on December 13, 2019, and placed him in confinement due to an Office of the Inspector General (OIG) investigation. Id. at 27. In this environment, Ratley saw both Burkett and one of the inmates who attacked him. Id. On January 2, 2020, Ratley started right-shoulder physical therapy. Id. at 29.

On January 10, 2020, Ratley began to complain about left-shoulder pain to the physical therapist. Id. On March 12, 2020, he saw a primary care physician about the pain, and was given injections for pain and swelling, and advised to do therapy in the dormitory to increase range of motion. Id. at 30. Dr. Laubaugh, an orthopedic surgeon, failed to order an x-ray on March 12, 2020. Id. at 9-10. On April 10, 2020, a nurse saw Ratley in sick call regarding bilateral shoulder pain and ordered an x-ray of the left shoulder. Id. at 10, 30. The x-ray showed, "impacted anterior glenohumeral joint dislocation," for which he had left shoulder ORIF surgery on June 5, 2020. Id.

Next, Ratley had an orthopedic follow-up visit on June 19, 2020, and the x-ray showed, "unchanged impacted anterior glenohumeral joint dislocation," for which the orthopedic surgeon referred Ratley to another surgeon for a double reversal total shoulder replacement due to a Hills-Sachs Impaction Fracture. Id.; Doc. 28-1 at 32, Radiology Report, dated June 19, 2020. He saw a primary care physician about bilateral shoulder pain on July 14, 2020, and was given ibuprofen. AC at 30. At sick call on July 23, 2020, Ratley complained about right-shoulder pain, and days later, inquired about an update about his upcoming left-shoulder surgery. Id. On July 28, 2020, he saw a primary care physician about bilateral shoulder pain, and "[n]othing was done." Id. at 31. He filed grievances and also complained about bilateral shoulder pain on August 13, 2020 and right-shoulder pain on August 26, 2020 at his sick-call

visits. Id. On August 31, 2020, Ratley complained to a primary care physician about his chronic right-shoulder pain, and was told that surgery for his left shoulder was approved. Id. He continued to submit grievances related to his shoulder pain. Id. at 31-34.

Thereafter, Ratley complained about right-shoulder pain at sick call visits on September 11, 17, 2020; October 2, 2020; January 26, 2021; March 21, 2021; and May 17, 25, 26, 2021, and bilateral shoulder pain at sick call visits on October 10, 2020, and December 17, 2020. Id. On September 23, 2020, he saw a primary care physician, who informed him that the chronic right-shoulder pain was normal because of the hardware and previous injury. Id. at 32. Next, a primary care physician ordered "target" point injections on October 23, 2020, and an x-ray showed that the bones had healed, and hardware appeared normal. Id. at 33.[2] Again, on November 6, 2020, he received "target" point injections. Id. On July 19, 2021, a right-shoulder x-ray showed "mild OA [osteoarthritis] with stable postoperative changes with healed fracture." Id. at 34.

Regarding his left-shoulder pain, Ratley states that, on September 15, 2020, an orthopedic surgeon at Orlando Regional Medical Center told him that he needed a double reversal total shoulder replacement to correct the Hill-

---

[2] Ratley appears to be referring to a "trigger point injection," a procedure used to treat muscle pain.

Sachs Impaction Fracture. Id. at 32. On December 28, 2020, an orthopedic surgeon performed the double reversal total left-shoulder replacement. Id. at 33. Thereafter, in February, 2021, Ratley complained at sick call about the lack of a follow-up visit with an orthopedic surgeon. Id.

Ratley maintains that he suffered unnecessary delays related to the provision of medical care, contending he suffered with left-shoulder pain from January 10, 2020 (when he first complained to a physical therapist) to December 28, 2020, when an orthopedic surgeon performed the double reversal total shoulder replacement, and he suffered with right-shoulder pain from September 16, 2019, until November 4, 2019, when he had ORIF surgery. Id. at 10, 33. He calculates the delay as lasting 193 days (from June 19, 2020, when an orthopedic surgeon referred him to another orthopedic surgeon for additional left-shoulder surgery), and 478 days (from September 16, 2019, when Burkett assaulted him). Id. at 10.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[3] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In their Motion, Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh maintain that the Court should grant summary judgment in their favor as to Ratley's Eighth Amendment deliberate indifference claims against them. <u>See generally</u> Motion. They contend that they did not engage in any conduct that a reasonable juror could find rose to the level of deliberate indifference, Ratley has not offered any expert testimony to support his claim, and he cannot demonstrate a causal connection to any act or omission of these Defendants and any injury suffered. <u>Id.</u> at 12-23. In his Response, Ratley contends that there are genuine issues of material fact that preclude summary judgment. <u>See</u> Response at 2, 14. In their Reply, Defendants maintain that "[w]ithout expert testimony, Ratley's claims against the Medical Defendants fail as a matter of law[,]" and his claims also fail "because he has not established a causal connection between the Medical Defendants' treatment and his claimed damages." Reply at 2.

## V. Applicable Law

Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel

and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct. Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing Farmer, 511 U.S. at 834); Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).

As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).

> "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a

14

subjective inquiry." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). To meet the first prong, the plaintiff must demonstrate an "objectively serious medical need"—i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." <u>Id.</u> (alteration adopted) (quotations omitted). To satisfy the second, subjective prong, the plaintiff must prove that the prison officials "acted with deliberate indifference to [his serious medical] need." <u>Harper v. Lawrence Cnty.</u>, 592 F.3d 1227, 1234 (11th Cir. 2010) (quotation omitted). "To establish deliberate indifference," a plaintiff must demonstrate that the prison officials "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence." <u>Id.</u> (quotation omitted).[4] An inmate-plaintiff bears the burden to establish both prongs. <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007).

<u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 (11th Cir. 2020) (footnote omitted). Importantly, for allegedly inadequate medical treatment to rise to the level of a constitutional violation, the care must be "'so grossly

---

[4] The Eleventh Circuit previously recognized "a tension within [its] precedent regarding the minimum standard for culpability under the deliberate-indifference standard." <u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 n.2 (11th Cir. 2020). Regardless, the court stated that the "competing articulations–'gross' vs. 'mere' negligence"–may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard." <u>Id.</u>; <u>see also</u> <u>Patel v. Lanier Cnty.</u>, 969 F.3d 1173, 1188 n.10 (11th Cir. 2020). The court has resolved that tension by unequivocally instructing that an Eighth Amendment deliberate indifference claim requires a showing that a defendant "acted with more than gross negligence." <u>Wade v. McDade</u>, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis omitted).

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Hoffer, 973 F.3d at 1271 (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference . . . as can a doctor's decision to take an easier and less efficacious course of treatment" (internal citation omitted) or fail to respond to a known medical problem).

While the bar to establishing an Eighth Amendment deliberate indifference claim is high, the Eleventh Circuit Court of Appeals has instructed that it is "appropriately high." Wade v. McDade, 67 F.4th 1363, 1378 (11th Cir. 2023). Indeed, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotations and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to

16

subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## VI. Discussion and Analysis

## A. Expert Medical Testimony

Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh (Medical Defendants) contend that "Ratley's claims independently fail because he has not presented expert medical testimony that the Medical Defendants' treatment violated any standard of care, much less that it was so far below the standard of care that it amounts to deliberate indifference." Motion at 19. In their Reply, the Medical Defendants similarly argue that where a plaintiff has made no effort to support his allegations with a medical opinion, his claims fail as a matter of law and summary judgment is required. Reply at 2-3.

In his Response, Ratley counters that he requested that the Court appoint an expert. Response at 22. See Fed. R. Evid. 706 (Court-Appointed

Expert Witnesses). Indeed, the record shows Ratley filed "Plaintiff's Request for Court Appointed Independent Expert" (Doc. 92). On February 2, 2023, the Court denied the motion for court-appointed independent expert without prejudice to Ratley's right to refile the request if the case proceeds to trial. See Order (Doc. 119) at 3, 7.

Here, Ratley, who is proceeding as a pauper, made some effort to obtain an expert opinion by asking the Court to appoint an expert. Under these circumstances, the Court finds the Medical Defendants' argument that this Court should summarily grant the Medical Defendants summary judgment because Ratley failed to present expert testimony unpersuasive. As such, the Medical Defendants' motion for summary judgment based on the contention that Ratley's claims independently fail because he did not present expert medical testimony is due to be denied as to this contention. The Court will consider the remaining contentions in the Medical Defendants' Motion by relying on the record before the Court to determine whether there is a genuine issue of material fact regarding whether the Medical Defendants violated Ratley's constitutional rights under the Eighth Amendment.

## B. Eighth Amendment Deliberate Indifference

To withstand entry of summary judgment, Ratley is required to present evidence to show that there is a genuine issue for trial. The Medical Defendants argue that there is no evidence that they refused to treat Ratley or

18

were subjectively aware of any serious risk of harm to him. Motion at 12. They contend that Ratley received continuous care and treatment from the Medical Defendants as well as other medical professionals. Id. at 13. In providing care, the Medical Defendants aver that they appropriately exercised their medical judgment in determining how to treat Ratley, including making decisions as to whether emergency treatment or emergency transport was in order and whether any additional treatment or diagnostic testing was warranted. Id. They submit that Ratley merely presents a dispute over the adequacy of treatment and has failed to present substantial evidence of deliberate indifference. Id.

In his Response, Ratley argues that there are genuine issues of material fact to be resolved, and he offers a declaration in support. Response at 1-2. In his declaration, he complains that although Defendant Lee ordered an x-ray, he failed to comply with procedure for a medical emergency and transfer him to an outside hospital and failed to adequately respond to his second declaration of medical emergency. Id. at 2-4. He submits that the Medical Defendants declined to treat him with stronger medication, failed to transfer him, or place him in an infirmary. Id. at 5. He complains that right-shoulder surgery was delayed due to lack of hardware. Id. at 5-6. Once surgery was approved, he stated he was given just Tylenol for pain. Id. at 7. The first surgery was 49 days after the assault and 40 days after confirmation of a break

19

and need for surgery. Id. at 9. Therapy post-surgery was delayed as well. Id. at 10.

Beginning in October 2019, Ratley complained of tightening in his left shoulder. Id. at 8. From January to early February, he complained to the physical therapist of left shoulder pain, but x-rays were not taken until May 2020. Id. at 10. Ratley describes an eight-month delay in obtaining a procedure for the dislocation, which ultimately failed. Id. The third surgery was not performed until December 28, 2020. Id. Less than 24 hours after surgery, Ratley was placed in confinement and not given any prescribed pain medication. Id. at 11. He was only given Tylenol, and did not receive a post-surgery follow-up to remove the staples. Id. at 12. Ratley continued to complain of right shoulder pain, but RMC was unable to perform the requested scan and Ratley had not received a scan by the date of the filing of his complaint. Id. Ratley contends that his left shoulder was injured, dislocated, and not treated, and by the time it was finally diagnosed, the joint was destroyed, and he had to have total shoulder arthroplasty in December 2020. Id. at 14.

Ratley avers that his injury constituted a major medical need, treatment was delayed, his unbearable pain was not adequately addressed, surgical treatment was delayed causing significant damage that needs to be rectified, untold grievances and complaints went unheeded, and the Medical Defendants were aware of the extreme pain and suffering but chose not to provide adequate

care and medication. Id. at 16-17. He submits that there are genuine issues of material fact remaining. Id. at 16.

In their Reply, the Medical Defendants contend that Ratley's deliberate indifference claims fail because he cannot demonstrate causation to support his claims. Reply at 3-7. They submit that Ratley has not demonstrated with verifying medical evidence that he suffered any adverse consequence from the alleged delay in treatment. Id. at 3. They argue that Ratley's allegations merely amount to a dispute over a course of treatment, without establishing deliberate indifference. Id. at 6.

The Medical Defendants also contend that Ratley has not produced evidence of any subjective intent to punish. Id. at 7-9. They submit Ratley has failed to present substantial evidence of this element and summary judgment should be granted. Id. at 8.

"[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew]." Daniels v. Jacobs, 753 F. App'x 748, 757-58 (11th Cir. 2018) (quoting Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017) (quotation and citations omitted)). Thus, the Court will do so.

### 1. Ira Lee, APRN (Advanced Practice Registered Nurse)

Ratley alleges that Defendant Lee failed to adequately assess his injury and made a wrongful determination of injury on September 18, 2019. AC at 7. Ratley complains that due to the appearance of the injury, fracture/dislocation was probable, but Lee only gave ibuprofen tablets, a no lift pass, and ordered an x-ray, rather than sending Ratley for immediate outside medical attention. Id. Ratley complains that Lee used poor judgment when he failed to notify or request outside medical attention on September 20, 2019, and ordered one dose of Solu-Medrol for an injury site that was numb, with only a moderate pulse with Ecchymotic (pallor) and hematoma present. Id. at 7-8.

Notably, Lee submitted a Declaration of Ira Lee, APRN (Doc. 113-1; Lee's Declaration), which states in pertinent part:

> Per FDOC policy, ARNPs are permitted to exercise their independent medical judgment in determining whether an inmate meets the criteria for emergency transport, outside medical attention, treatment at an outside facility or hospital, prescriptions, and passes. If an inmate met any such criteria(s), it would be noted in the medical records.
>
> During the time period relevant to Mr. Ratley's claims, I did not have the ability to schedule inmates' surgeries, sick call appointment, and appointments at outside medical facilities or hospitals.

Lee's Declaration at 2 (paragraph enumeration omitted).

The record demonstrates medical staff saw Ratley on September 18, 2019, after Ratley reported that he fell while at work a couple of days prior to his medical visit. (Doc. 113-5 at 8-9).[5] Ratley's chief complaint was that his right shoulder and arm were injured in a fall. Id. He complained of pain in his right arm, shoulder, and shoulder blade. Id. The nurse reported Ratley's pulse distal to injury as strong. Id. The nurse noted the skin around the injury site was warm, pink, Ecchymotic with hematoma present. Id. The nurse recorded no extremity numbness or tingling and that Ratley was able to move the affected extremity. Id. The nurse noted moderate swelling at bicep level of right arm, the skin was intact, and there was no bleeding. Id.

Defendant Lee ordered an x-ray to the right shoulder and humerus, a pass for no lifting, pushing, or pulling, and pain medication. Id. Lee directed Ratley be given ibuprofen 200mg (2-3 tablets by mouth for pain) or acetaminophen 325mg (2 tablets by mouth for pain). Id. Lee also directed that the pass be issued as directed. Id. The Chronological Record of Health Care has a diagram of the injury, notations about the injury, and directives. Id. at 9. On that same date, Lee completed a Radiology Request Form for Ratley's right

---

[5] The record includes the form: "Florida Department of Corrections Office of Health Service Fracture/Dislocation/Sprain Protocol [with] Note: All protocols completed by LPNS must be reviewed and cosigned by a RN or Clinician." (Doc. 113-5 at 8). A. Agner, RN, co-signed the form and the clinician notified Lee. Id.

elbow, humerus, and shoulder. Id. at 10. The document states, "scheduled 9/25/19[.]" Id.

Ratley reported back to medical on September 20, 2019, complaining his arm was swollen and numb. Id. at 12. The clinician found the pulse moderate and the skin warm, Ecchymotic, with hematoma present. Id. Ratley complained of numbness and tingling. Id. He was able to slightly move his limb. Id. The clinician noted moderate swelling. Id. The clinician notified Lee who ordered Solu-Medrol 125 mg and noted Ratley was scheduled to see the doctor on Monday, September 23, 2019. Id. Lee also directed that a covered ice pack be applied to the affected area for 15-20 minutes. Id. He ordered pain medication: ibuprofen 200mg (2-3 tablets by mouth for pain) or acetaminophen 325mg (2 tablets by mouth). Id. He also required a recheck of distal pulse prior to discharge, which was done and found to be moderate. Id. Dr. Colombani signed the protocol form. Id.

As scheduled, on September 25, 2019, the radiologist took x-rays and found "[m]arkedly comminuted fracture displacement of the humeral head/neck. Markedly displaced greater tuberosity with oblique fracture through the proximal humerus." Id. at 15. The results were reported, and it was noted that the doctor: "approved emergent ortho consult." Id. at 14.[6]

---

[6] The Consultant's Report, dated September 27, 2019, is in the record. (Doc. 116-13 at 3).

To prove deliberate indifference, a plaintiff must show he had a serious medical need, the objective prong. Ratley's injured right arm, which required surgery, was a serious medical need. Next, the plaintiff must demonstrate the medical provider acted with a state of mind that constituted deliberate indifference, the subjective prong. This would require Ratley to show the provider had subjective knowledge of a risk of serious harm yet disregarded that risk in a way that amounts to more than gross negligence. Finally, liability requires an affirmative causal connection between the defendant's alleged actions and the resulting injury. Thus, the acts or omissions must be the cause, not merely a contributing factor of the constitutionally infirm condition.

As such, Ratley, who received medical treatment, would need to show Lee intentionally withheld necessary treatment, delayed treatment for non-medical reasons, or provided cursory or grossly inadequate treatment. The record demonstrates that the medical providers recognized that there may be a fracture, dislocation, or sprain, as evinced by the use of the relevant protocol. The clinician contacted Lee who immediately, without delay, ordered x-rays, directed the issuance of a pass to prevent lifting, pushing, and pulling, and ordered the immediate administration of pain medication. Lee signed the order to request x-rays that same day. Once notified of abnormal x-rays, an emergent orthopedic consultation was approved and then took place.

The material point of contention between the parties is whether Lee ignored the risk of harm to Ratley by conduct that was more than gross negligence. Ratley submits that Lee should have directed that Ratley be immediately referred to outside medical attention on September 19th and 20th. On this point, Lee meets his burden to demonstrate there is no genuine issue of material fact, and Ratley fails to overcome that showing.

Lee did not exhibit deliberate indifference to Ratley's serious medical need. There was no delay in the request for x-rays to obtain a proper diagnosis and to aid in determining the proper course of treatment. Lee directed that Ratley be immediately provided with pain medication and a no lifting pass. When Ratley returned the next day with moderate swelling in his limb, Lee immediately ordered Solu-Medrol, a potent anti-inflammatory corticosteroid. Lee also directed that an ice pack be applied to the injured site, and more pain medication be given. He also directed that there be a recheck of Ratley's distal pulse before discharge.

Ratley points to no evidence that Lee withheld treatment, delayed treatment for non-medical reasons, or provided cursory or grossly inadequate treatment. Ratley received treatment, pain medication and anti-inflammatory medication, he was issued a medical pass, and he was referred for x-rays, which were ordered. Once the medical providers were notified of the results of the x-rays, Ratley was immediately authorized for an emergent orthopedic

26

consultation. The care Ratley received was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Harris</u>, 941 F.2d at 1505 (citation omitted).

The question of whether Lee should have selected a different course of treatment by recommending that Ratley be sent to an outside provider, "is a classic example of a matter for medical judgment[.]" <u>Adams</u>, 61 F.3d at 1545. Since it is a matter of professional judgment, it does not represent cruel and unusual punishment. <u>Estelle</u>, 429 U.S. at 107-108. Moreover, the diagnostic technique chosen, x-rays, proved to be beneficial, showing the location and extent of injury. Once the arm became swollen, Lee responded by ordering an anti-inflammatory corticosteroid, ice, and pain medication, all meant to reduce Ratley's pain and discomfort, certainly not conduct that shocks the conscience. <u>See</u> <u>Barnes v. Martin Cnty. Sheriff's Dep't</u>, 326 F. App'x 533, 536 (11th Cir. 2009) (the fact that the defendants eventually ordered an x-ray and MRI "indicates they were not deliberately indifferent"). Moreover, a medical decision not to use other measures "is, at most, 'medical malpractice.'" <u>Id.</u> (quoting <u>Estelle</u>, 429 U.S. at 107).

Apparently Lee, exercising his independent medical judgment, determined that Ratley did not meet the criteria for emergency transport, outside medical attention, or treatment at an outside facility or hospital as he did not note such a need in the medical records. <u>See</u> Lee's Declaration. Lee did

not deny medication "for no reason at all." Wade, 2023 WL 3574362, at *9. Instead, he prescribed medication and other treatments, and did so without delay. On this record Ratley fails to show that Lee exhibited reckless disregard for Ratley's condition.

According to Ratley, Lee should have done something more or different, but "federal courts are generally reluctant to second guess medical judgments." Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). And "[w]hile [Ratley] may have desired a different method of treatment, such a desire does not cause the medical treatment that he received to be inadequate and does not constitute deliberate indifference on the part of the defendant[.]" Barnes, 326 F. App'x at 536. The sort of difference in medical opinion of which Ratley complains does not support a contention of deliberate indifference under § 1983. Waldrop, 871 F.2d at 1033 (malpractice does not constitute deliberate indifference "[n]or does a simple difference in medical opinion"). Nor does the determination by Lee that Ratley could be cared for at the prison make it plausible that he knew of a serious risk of harm and disregarded it.

Ratley identifies no evidence that Lee intentionally refused to provide care to Ratley. To the contrary, the record establishes that Lee treated Ratley, requested appropriate diagnostics (x-rays), and provided additional care and pain relief. Ratley also fails to point to any evidence supporting a plausible

28

conclusion that a causal connection between any delay in ultimately receiving surgery and any action or inaction by Lee.[7] Indeed, as soon as the clinicians were notified of the abnormal x-rays, a consult was requested and approved. As such, Defendant Lee has discharged his burden on summary judgment, and Ratley fails to adequately go beyond the pleadings to demonstrate a genuine issue of material fact exists such that this case should be submitted to a jury. "[T]he bar to proving an Eighth Amendment deliberate-indifference claim is appropriately high," and Ratley has not met it. Wade, at 67 F.4th at 1378.

### 2. Dr. Colombani

Similar to his complaints about Defendant Lee, Ratley contends that Dr. Colombani subjected him to needless pain and suffering by reviewing orders and not ordering outside medical attention while only giving him ibuprofen and an arm sling. AC at 8. Dr. Colombani saw Ratley for his right shoulder injury on September 24, 2019, and issued a sling, a pass, and requested x-rays. (Doc. 113-5 at 14). After x-rays were performed the next day, an emergent orthopedic consultation request was entered that day. Id. at 14-15. Two days

---

[7] Ratley's contention that an x-ray technician notified security and Lee that Ratley needed to be immediately sent to an outside hospital is not supported in the medical records, and even if such information were contained in the records or was otherwise apparent, an x-ray technician is not a doctor or a clinician that would be qualified to make that sort of medical assessment. See AC at 8; Motion at 15 n.5. Nor does Ratley contend this information was relayed to Lee or the other Medical Defendants. Of note, as soon as the clinicians (including Lee) received notice of the abnormal x-rays, an orthopedic consultation was requested and approved by a doctor. (Doc. 113-5 at 14).

later, September 27, 2019, Ratley received his orthopedic consultation at RMC
and additional x-rays were taken. Id. at 17-20. Thereafter, on September 30,
2019, Dr. Colombani, relying on the additional information provided from the
consultation, requested an urgent prior approval for a fractured/dislocated
right shoulder open reduction. Id. at 21.

Dr. Colombani, attests,

> Per FDOC policy, MDs are permitted to exercise
> their independent medical judgment . . . in
> determining whether an inmate meets the criteria for
> emergency transport, outside medical attention,
> treatment at an outside facility or hospital,
> prescriptions, and passes. If an inmate met any such
> criteria(s), it would be notated in the medical records.
>
> During the time period relevant to Mr. Ratley's
> claims, I did not have the ability to schedule inmates'
> medical appointments, including surgeries and
> appointments at outside medical facilities or hospitals.

Declaration of Leslie Colombani, MD (Doc. 113-3; Colombani's Declaration) at
2 (paragraph enumeration omitted).

The question is whether Dr. Colombani's failure to send Ratley for
outside medical attention on September 24, 2019, was "so reckless – so
conscience-shocking – that it violates the Constitution." Hoffer, 973 F.3d at
1272. Again, Ratley received medical attention, and "federal courts are
generally reluctant to second guess medical judgments and to constitutionalize
claims which sound in state tort law." Id (citing Harris, 941 F.2d at 1507

(quotation omitted)). Not only did he receive medical attention at HCI, Ratley was sent to RMC for an orthopedic consultation and additional x-rays. Although Ratley believes this was sub-par treatment compared to that which an outside hospital may provide, the Eighth Amendment "does not impose . . . a duty to provide care that is ideal, or of the prisoner's choosing." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc).

Ratley contends that Dr. Colombani should have sent him to an infirmary on September 30, 2019. AC at 20. On that date, Ratley went to medical claiming his cellmate had stepped on his arm during a bunk incident. (Doc. 113-5 at 22) ("My bunkie stepped on my arm where it's already broken"). Noting that the patient had a confirmed fracture (arm already broken), the clinician notified Dr. Colombani. Dr. Colombani ordered shots and noted, "emergent consult for surgery." Id. According to Ratley, that day, Dr. Colombani ordered three shots: one for pain and two for swelling and bruising. AC at 20; (Doc. 113-5 at 22).

Viewing the evidence in the light most favorable to Ratley, the Court finds Dr. Colombani has carried his burden on summary judgment. Dr. Colombani demonstrates by reference to the medical records that there are no genuine issues of material fact to be determined at trial. Dr. Colombani provided pain medication and medication to reduce swelling. Specialist consultations had been requested and performed. An emergent consult for

31

surgery was duly noted. Ratley's subjective belief that he should have been sent to the infirmary or elsewhere is "not an appropriate basis for grounding liability under the Eighth Amendment." See Adams, 61 F.3d at 1545. That is a decision for the medical providers. As to any complaints about lack of pain medication or needing a different type of pain medication, see AC at 21, whether to prescribe a particular or different pain medication is a medical judgment not subject to Eighth Amendment scrutiny.

Given the evidence submitted by Defendant Colombani, the Court finds he has met his burden of showing that he did not violate Ratley's constitutional rights. Dr. Colombani provided timely and adequate medical care. He met Ratley's pain-management needs as well. To the extent that Ratley complains about his course of treatment, such a complaint would be at most a claim of negligence or a disagreement with his medical treatment choice, neither of which would be sufficient to state a claim of deliberate indifference to a serious medical condition. Indeed, "[w]here an inmate receives medical treatment but desires different modes of treatment, the care provided does not amount to deliberate indifference." McLeod v. Sec'y, Fla. Dep't of Corr., 679 F. App'x 840, 843 (11th Cir. 2017) (citing Hamm, 774 F.2d at 1575).

Moreover, Dr. Colombani did not ignore the risk of harm to Ratley by conduct that was more than gross negligence. On this point, Dr. Colombani meets his burden to demonstrate there is no genuine issue of material fact, and

Ratley fails to overcome that showing. Based on the record, there is no evidence that Dr. Colombani withheld treatment, delayed treatment for non-medical reasons, or provided cursory or grossly inadequate treatment. Any decision made as to whether to place Ratley in an infirmary or send him to a hospital or other facility is a matter for medical judgment and does not constitute cruel and unusual punishment. Estelle, 429 U.S. at 107. Dr. Colombani elected to provide immediate care including an arm sling, passes, oral pain medication and shots for pain and swelling pending results of x-rays, conduct that does not shock the conscience. Ratley was referred to a specialist and a consultation and additional x-rays were performed. Additionally, there was an emergent consult for surgery in place. This record shows that Dr. Colombani did not exhibit reckless disregard for Ratley's condition as he received diagnostic care as well as pain medication and medication to reduce discomfort. Dr. Colombani's conclusion that Ratley could be cared for at the prison, with consultation by an orthopedic specialist, does not make it plausible that he knew of a serious risk of harm and disregarded it, nor does it mean that he subjectively knew of a serious risk of harm and disregarded it. Lastly, Ratley provides no evidence showing a causal connection between any delay in receiving surgery and any action or inaction by Dr. Colombani.

Dr. Colombani has discharged his burden on summary judgment, and Ratley fails to adequately go beyond the pleadings to demonstrate a genuine

issue of material fact exists such that this case should be submitted to a jury. As such, with regard to Dr. Colombani the Motion is due to be granted.

### 3. Dr. Laubaugh

Ratley contends that Dr. Laubaugh mistreated him on March 12, 2020, by failing to order an x-ray on that date. AC at 9-10. Ratley complains that an x-ray was not ordered until April 10, 2020, after he made eleven complaints of left shoulder pain.[8] Id. at 10. He alleges the lack of adequate medical care caused him to suffer undue pain and be subjected to two additional surgeries. Id.

The record demonstrates that Ratley was received at Taylor Correctional Institution (TCI) on January 22, 2020. (Doc. 113-5 at 66). On January 24, 2020, he told TCI physical therapy staff his left shoulder was starting to hurt. Id. at 69. On January 27, 2020, he informed a physical therapy staff member his "good side" was hurting. Id. On February 3, 2020, he told a physical therapy staff member his "other shoulder" was getting worse. Id. at 74. On February 7, 2020, he complained to physical therapy staff of sharp pain on his left side and limited movement. Id. at 77. On March 4, 2020, there is a notation in the medical record that Ratley was being referred to a provider. Id. at 78. On March 9, 2020, there is a notation in the chronological record of care that a

---

[8] Ratley states the x-ray of his left shoulder occurred on May 26, 2020. Response at 10.

medical appointment had to be rescheduled due to a security lock-down. (Doc. 113-6 at 3).

Dr. Laubaugh first saw Ratley on March 12, 2020. (Doc. 113-6 at 4). He treated Ratley with injections, passes, and instructions regarding shoulder exercises. Id. He also made a notation for the next provider that if Ratley's condition did not improve with exercise, an orthopedic referral should be requested. Id. Thus, Dr. Laubaugh did not ignore Ratley's complaints about ongoing left-shoulder pain and discomfort.[9]

Dr. Laubaugh attests,

> Per FDOC policy, MDs are permitted to exercise their independent medical judgment . . . in determining whether an inmate meets the criteria for emergency transport, outside medical attention, treatment at an outside facility or hospital, prescriptions, and passes. If an inmate met any such criteria(s), it would be notated in the medical records.
>
> During the time period relevant to Mr. Ratley's claims, I did not have the ability to schedule inmates' medical appointments, including surgeries and appointments at outside medical facilities or hospitals.

Declaration of Richard Laubaugh, MD (Doc. 115-1; Laubaugh's Declaration) at 2 (paragraph enumeration omitted).

Ratley's disagreement with Dr. Laubaugh's treatment plan is insufficient to create a genuine issue of fact as to his deliberate indifference

---

[9] Any delay caused by security staff is not attributable to Dr. Laubaugh.

claim. Whether Dr. Laubaugh should have ordered x-rays rather than providing injections, passes, and exercise instructions "'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams, 61 F.3d at 1545. Based on this record, it cannot be said that Dr. Laubaugh ignored or discounted Ratley's serious medical issue. Instead, Dr. Laubaugh provided Ratley with injections and a treatment plan that involved exercises. See Bismark, 213 F. App'x at 896 ("A plaintiff cannot establish deliberate indifference simply by second guessing the conclusions reached by a prison medical official in the exercise of his medical judgment.").

While not the treatment plan Ratley desired, he points to no evidence from which a jury could conclude that the treatment given on that date was so grossly incompetent as to shock the conscious or that it caused an exacerbation of his condition. Notably, Dr. Laubaugh left a note for the next provider that if there was no improvement, an orthopedic referral should be requested. "Because the obligation to provide medical care 'doesn't necessarily demand curative care,'" Sims v. Figueroa, No. 21-10647, 2022 WL 188485, at *5 (11th Cir. Jan. 21, 2022) (not reported in F. Rptr.) (quoting Hoffer, 973 F.3d at 1272), cert. denied, 142 S. Ct. 2888 (2022), Dr. Laubaugh's decision to take a more conservative path to treatment does not amount to incompetent or inadequate care that would amount to deliberate indifference to Ratley's medical condition

36

in violation of the Eighth Amendment. Ratley presents no evidence supporting an inference that Dr. Laubaugh's care was not, at least, minimally adequate care. Accordingly, Ratley has failed to present evidence creating a genuine issue for trial on the claim that Dr. Laubaugh was deliberately indifferent to his medical condition and the Motion is due to be granted.

### 4. Dr. Brenes-Catinchi, MD

Ratley contends that he came under the care of Dr. Brenes-Catinchi on September 14, 2020, and the doctor mistreated him through lack of care and wanton disregard for his health, causing him undue pain and suffering. AC at 10. Ratley complains that as a result of this doctor's medical mistreatment an untreated dislocation turned into a Hill-Sachs Impaction Fracture. Id. He also complains that Dr. Brenes-Catinchi failed to address his chronic right-shoulder pain. Id.

The record shows that Ratley arrived at CFRC from RMC on September 14, 2020, and was seen by Dr. Brenes-Catinchi. (Doc. 113-7 at 2). Dr. Brenes-Catinchi noted that Ratley arrived pending a "surgical (ortho) consult." Id. Dr. Brenes-Catinchi noted a right shoulder sling in place and the patient had chronic right-shoulder pain. Id. Dr. Brenes-Catinchi admitted Ratley to the infirmary for 24-hour observation. Id. The next day, as previously scheduled, Ratley was evaluated by an orthopedic specialist, a CT scan was ordered, and a new consultation request submitted. Id. at 3.

On September 22, 2020, Ratley went to sick call complaining of right-shoulder pain. Id. at 5-6. The next day, September 23, 2020, Dr. Brenes-Catinchi saw Ratley and addressed his complaints of six months of right-shoulder pain. Id. at 7. Dr. Brenes-Catinchi noted that the pain was possibly due to previous injury and surgery. Id. He ordered x-rays for evaluation, ordered a follow-up appointment for October, and educated Ratley about his exercises as previously instructed by a physical therapist. Id. The radiology report for October 5, 2020, shows, "[n]o acute bony abnormality. Intact hardware."[10] Id. at 13.

On October 23, 2020, Dr. Brenes-Catinchi saw Ratley for a follow-up appointment. Id. at 19. The doctor noted right-shoulder pain was still present and x-rays were done. Id. Dr. Brenes-Catinchi recommended trigger point injections for chronic right-shoulder pain, and noted that Ratley agreed to this treatment. Id. Dr. Brenes-Catinchi's notes reflect that Ratley was scheduled to receive trigger point injections on October 30, 2020. Id. The point injections for chronic right-shoulder pain possibly due to previous damage and surgery were administered on November 6, 2020. Id. at 22.[11]

---

[10] A previous radiology report from July 8, 2021, provided the following conclusion: "[m]ild OA. Stable postoperative changes with healed fracture. No acute pathology in the right shoulder." (Doc. 113-7 at 12).

[11] The medical record reflects that the trigger point injections were rescheduled, but Ratley points to no evidence that this was caused by Dr. Brenes-Catinchi.

Dr. Brenes-Catinchi attests,

> Per FDOC policy, MDs are permitted to exercise their independent medical judgment . . . in determining whether an inmate meets the criteria for emergency transport, outside medical attention, treatment at an outside facility or hospital, prescriptions, and passes. If an inmate met any such criteria(s), it would be notated in the medical records.

> During the time period relevant to Mr. Ratley's claims, I did not have the ability to schedule inmates' medical appointments, including surgeries and appointments at outside medical facilities or hospitals.

Declaration of Jason Brenes-Catinchi, MD (Doc. 113-2; Brenes-Catinchi's Declaration) at 2 (paragraph enumeration omitted).

Here, the record shows that Dr. Brenes-Catinchi did not disregard Ratley's condition or his complaints of pain. On September 14, 2020, Dr. Brenes-Catinchi admitted Ratley to the infirmary for observation prior to his previously scheduled orthopedic consultation. An orthopedic specialist evaluated Ratley, as planned. When Dr. Brenes-Catinchi next saw Ratley on September 23, 2020, he ordered x-rays and a follow-up appointment and also directed Ratley to continue his prescribed exercises. A radiologist performed an x-ray. When Ratley returned with complaints of ongoing pain, Dr. Brenes-Catinchi recommended trigger point injections, which were administered. As such, Dr. Brenes-Catinchi did not ignore Ratley's complaints about ongoing right-shoulder pain and discomfort. Brenes-Catinchi placed Ratley in the

infirmary, noted he was seeing an orthopedic specialist, ordered additional diagnostic techniques, recommended continued performance of prescribed exercises, and prescribed trigger point injections to relieve Ratley's right-shoulder pain.

As far as Ratley's complaints of left-shoulder pain, the record shows he had a consultation pending for a left-shoulder repair in July 2020 and medical staff issued a sling and prescribed medication. (Doc. 113-6 at 39). The record also shows that in August 2020, he was placed on medical quarantine isolation in a dormitory. Id. at 45. On August 31, 2020, a nurse noted that left-shoulder surgery was pending at Orlando Regional Medical Center (ORMC). Id. at 49. The infirmary record of September 14, 2020, shows a pending orthopedic consultation. (Doc. 113-7 at 1). The nurse noted no signs of distress and Ratley made no complaints of medical needs. Id. Ratley saw the orthopedic specialist as scheduled on September 15, 2020, and the specialist requested previous orthopedic notes and a CT scan of Ratley's shoulder. Id. at 3. Dr. Brenes-Catinchi ordered the CT scan and directed a follow-up appointment, as requested by the specialist. Id. Dr. Brenes-Catinchi recorded that the CT scan was completed on September 25, 2020, and there was to be a follow-up appointment with the specialist pending the results. Id. at 9. On October 5, 2020, passes were renewed for Ratley's left arm. Id. at 11. On October 10, 2020, Ratley complained of ongoing pain in his shoulders. Id. at 15. Ratley was seen

on October 14, 2020, for complaints that his medication dosage was not enough, but he decided his concerns could wait for his medical appointment. Id. at 16-17. On October 23, 2020, Dr. Brenes-Catinchi saw Ratley for a follow-up appointment, noting x-rays had been done. Id. at 19. Dr. Brenes-Catinchi recommended trigger point injections for pain relief, and Ratley agreed with that recommendation. Id. The injections were administered on November 6, 2020. Id. at 22.

Dr. Brenes-Catinchi did not have the ability to schedule Ratley's surgery at ORMC. Brenes-Catinchi's Declaration at 2. Nevertheless, Dr. Brenes-Catinchi could and did attempt to ameliorate Ratley's pain and discomfort by ordering trigger point injections. The records reflect that a total left-shoulder replacement surgery was performed on December 28, 2020. (Doc. 113-7 at 30). After his surgery, Ratley was seen by a medical provider on January 4, 2021, who noted Ratley was in obvious discomfort. Id. at 31. The medical provider continued the sling, gave Ratley pain medication, noted there would be a follow-up with the surgeon for suture removal and re-evaluation. Id. The provider also noted the need for notification to remove sutures if no follow-up. Id. When additional medication did not arrive, the nurse obtained a new order. Id. at 33. A medical provider saw Ratley in sick call on January 26, 2021. Id. at 36. When Ratley complained of lack of a post-surgery follow-up appointment, a medical provider referred his complaint to surgery. Id. at 38-39. On February

10, 2021, an x-ray was taken of Ratley's left shoulder and the following conclusion was rendered: "[i]ntact shoulder arthroplasty hardware without evidence of complication, new since prior." Id. at 40. Dr. Brenes-Catinchi signed off on this report. Id. Ratley submitted a formal grievance about a follow-up with the surgeon for physical therapy on February 11, 2021, and the medical provider denied the grievance noting an upcoming appointment. Id. at 41. Dr. Brenes-Catinchi, on February 16, 2021, made a formal consultation request for "PT post surgery (as recommended by ortho)." Id. at 43. On that same day, Ratley was seen in the orthopedic clinic. Id. at 44. The specialist recommended a follow-up in four weeks, which was duly ordered. Id. at 42, 44. Ratley was evaluated and seen for physical therapy. Id. at 46-48, 56, 58-59. On April 13, 2021, Ratley refused the remainder of his physical therapy visits complaining of pain. Id. at 60-61, 64.

The record establishes that Dr. Brenes-Catinchi neither ignored Ratley's condition, nor his complaints of pain. Dr. Brenes-Catinchi did not have the authority to schedule the surgery. Ratley saw the specialist, and additional diagnostic techniques were utilized. Ratley had his surgery, and Dr. Brenes-Catinchi made a formal consultation request for therapy after recommendation by the orthopedic specialist. Ratley received physical therapy until he declined further therapy.

Considering the record, the Court finds Dr. Brenes-Catinchi has carried his burden of showing that there are no genuine issues of material fact to be determined at trial. Although Ratley believes the doctor could have done something more or different, the treatment he received was not so grossly incompetent as to shock the conscious or that it caused an exacerbation of his condition. Much about that which Ratley complains was not in Dr. Brenes-Catinchi's control. He did not control the surgery timetable nor scheduling. He justifiably relied upon the recommendations of specialists, the skills of the physical therapists, and the diagnostic techniques and tools employed by others. Given the medical records, Ratley points to no evidence supporting even an inference that Dr. Brenes-Catinchi failed to provide timely and adequate medical care for Ratley's injuries. He neither disregarded a risk of serious harm to Ratley's shoulders nor displayed conduct beyond gross negligence. He met Ratley's pain management needs by ordering trigger point injections and encouraging compliance with physical therapy. On this record, any "occasional gap in prescription coverage was merely negligent[.]" Brennan v. Headley, 807 F. App'x 927, 937 (11th Cir. 2020).

To the extent that Ratley complains about the Medical Defendants' course of treatment, such a complaint would be at most a claim of negligence or a disagreement with their medical treatment choice, neither of which is sufficient to state a claim of deliberate indifference to a serious medical need.

See Harris, 941 F.2d at 1505. Nor has Ratley provided specific facts or medical evidence suggesting that any delay in the provision of medical care for his shoulder injuries/damage was unreasonable, especially given that multiple medical professionals closely monitored, treated, and evaluated him during the relevant time period.

In his Response at 14, Ratley references his own statement of medical history, claiming it is Dr. Laubaugh's medical opinion. (Doc. 116-45 at 2). On April 15, 2022, Ratley reported his history of present illness as a left shoulder injury, dislocated, and not treated. Id. He asserted that, when it was finally diagnosed, the joint was destroyed, and he eventually had to have total shoulder arthroplasty in December 2020. Id. "[H]e says left shoulder has no pain and full motion, no problem. [R]ight shoulder was injured in scuffle with officers sustaining a fracture which was repaired November 2019. Righ[]t shoulder still hurts and has limited motion." Id. Dr. Laubaugh observed Ratley's movements and observed full range of motion of the left shoulder but noted limited movement of the right shoulder. Id. at 3. Dr. Laubaugh provided an Impression Diagnosis: "right proxomal humerus fracture repaired. November 2019 with residual loss of motion and pain[;] left shoulder dislocation resulting in total shoulder arthroplasty, December 2020[.]" Id. He demonstrated shoulder exercises for the right shoulder and stated he would order therapy. Id.

44

Ratley complains that he did not receive "curative care." However, these Medical Defendants used a broad range of devices and directives to address Ratley's medical needs, including a sling and medical passes. They sought various diagnostic techniques to determine the source of Ratley's pain and discomfort and referred him to specialists for additional diagnosis. They employed conventional treatment (the issuance of pain medication, the use of trigger point injections, referral to physical therapy, and emphasized the use of exercises to relieve pain and discomfort). Nothing in the records suggests their approach to treatment was not so reckless or conscience-shocking that it amounts to a constitutional violation.

The Court has reviewed the medical evidence, and Ratley has not provided any medical evidence to establish that the Medical Defendants' decisions "seriously exacerbate[d] the medical problem." Taylor v. Adams, 221 F.3d 1254, 1260 (11th Cir. 2000) (citation omitted). Again, none of these Medical Defendants had the ability to schedule medical appointments, including surgeries. Even viewing the evidence in the light most favorable to Ratley, the record does not support a conclusion that the treatment chosen by the Medical Defendants and the medical care provided was inadequate or improper. It was neither reckless nor conscience shocking. As such, the Motion is due to be granted.

## C. Causal Connection

The Medical Defendants also contend that Ratley has offered no proof that any delay in treatment attributable to one of these Medical Defendants (either in obtaining x-rays, requesting emergency medical transport to an outside hospital, or otherwise) altered the course of his condition or caused any increased physical injury. Motion at 22. Even assuming Ratley could show that these Defendants were deliberately indifferent to his serious medical needs, there is no evidence in the record to support a conclusion that the Medical Defendants' alleged actions or inactions during the period they provided medical care caused Ratley any injury. On the contrary, the record shows these Defendants provided care that ameliorated Ratley's pain and discomfort, or they referred him to the experts and specialists who could render specialized diagnostic techniques, treatment, and care.

"[T]o prevail, a plaintiff must show causation between the deliberate indifference and his injury." Ravan v. Talton, No. 21-11036, 2023 WL 2238853, at *7 (11th Cir. Feb. 27, 2023) (not reported in F. Rptr.) (citing Mann, 588 F.3d at 1306-07). Ratley has not produced evidence from which a jury could conclude that the actions of these Defendants had a detrimental effect. See Sims, 2022 WL 188485, at *5 (a plaintiff's failure to provide evidence other than speculation will not suffice to establish the detrimental effect of delay in medical treatment). As he has not placed evidence in the record to establish

the detrimental effect of delay, the Medical Defendants are entitled to summary judgment.

Accordingly, it is now

**ORDERED**:

1.     Defendants Lee, Colombani, Brenes-Catinchi and Laubaugh's Motion for Summary Judgment (Doc. 113) is **GRANTED** to the extent provided in the Order.

2.     Pursuant to Federal Rule of Civil Procedure 54(b), there being no just reason for delay, the **Clerk** shall enter judgment in accordance with this Order.

3. The **Clerk** shall terminate Defendants Lee, Colombani, Brenes-Catinchi, and Laubaugh as parties.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of September, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

sa 8/22
c:
Michael Steven Ratley
Counsel of Record