UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHAEL STEVEN RATLEY,

        Plaintiff,

vs.                                 Case No. 3:21-cv-598-MMH-LLL

RICKY D. DIXON, et al.,

        Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Michael Steven Ratley, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on June 14, 2021, by filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint (AC; Doc. 28) with exhibits (Doc. 28-1) on October 12, 2021.[1] In the AC, Ratley asserts claims pursuant to 42 U.S.C. § 1983. These Defendants remain: (1) FDOC Secretary Ricky D. Dixon;[2] (2) FDOC Regional Director Palmer; (3) Hamilton Correctional Institution's (Hamilton C.I.) Warden Glenn Young; (4)

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

[2] Ratley originally named Mark Inch in his official capacity as Secretary of the FDOC, a position he no longer holds. As such, under Federal Rule of Civil Procedure 25(d)(1), the Court substituted Ricky D. Dixon, the current Secretary of the FDOC, as the proper party Defendant. See Order (Doc. 64 at 34 n.12).

Hamilton C.I.'s Assistant Warden Gerald Stewart; and (5) Sergeant E. Burkett. Ratley alleges that Defendants violated his Eighth Amendment rights when Defendant Burkett assaulted him and Defendants Dixon, Palmer, Stewart, and Young failed to remedy the mistreatment related to the assault and resolve Ratley's inadequate medical care.

Ratley also originally named as Defendants the following medical personnel who interacted with, and medically treated, him following the assault: Dr. Leslie Colombani, M.D., Hamilton C.I. Chief Health Officer; Nurse Ira Lee; Dr. Richard Laubaugh, M.D., orthopedic surgeon at Taylor Correctional Institution (Taylor C.I.); and Dr. Jason Brenes-Catinchi, M.D., Central Florida Reception Center (CFRC) Medical Director (collectively "Medical Defendants"). <u>See</u> AC. The Medical Defendants moved for summary judgment (Doc. 113); and on September 28, 2023, the Court granted their motion, finding the record evidence failed to create a genuine issue of material fact on the claim that any Medical Defendant acted with deliberate indifference to Ratley's serious medical needs following Burkett's alleged assault (Doc. 145).

Now before the Court is Defendants Dixon, Palmer, Stewart, and Young's[3] (collectively "FDOC Defendants") Motion for Summary Judgment (Motion; Doc. 127), with exhibits (Docs. 128-1 through 128-7). The Court

---

[3] Defendant Burkett has not moved for summary judgment or filed any other dispositive motion in this case.

advised Ratley of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him to respond to the Motion. See Order (Doc. 5); Summary Judgment Notice (Doc. 114). Ratley filed a response in opposition to the Motion, see "Plaintiff[']s Declaration in Opposition to Defendants Dixon, Palmer, Stewart and Young's Motion for Summary Judgment" (Response; Doc. 150), with exhibits (Docs. 150-1 through 150-21); a brief in support of his Response, see "Plaintiff's Brief in Support of Declaration and Oppos[]ition to Defendant[]s Dixon, Palmer, Stewart and Young's Request for Summary Judgment" (Response Brief; Doc. 151); and a statement of disputed facts, see "Plaintiff's Statement of Disputed Factual Issues" (Doc. 152). FDOC Defendants filed a Reply (Reply; Doc. 168). FDOC Defendants' Motion is ripe for review.

## II. Ratley's Allegations[4]

Because Ratley's claims against Defendants Dixon, Palmer, Young, Stewart, and Burkett are the only issues before the Court, in this Order, in

---

[4] For the purposes of resolving Defendants' Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Ratley. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

summarizing Ratley's claims, the Court focuses on the allegations involving those Defendants.

In the AC, Ratley alleges that on September 12, 2019, while housed at Hamilton C.I., Defendant Burkett demanded that Ratley give him free items from the canteen where Ratley worked. AC at 13. When Ratley refused, Burkett made several threatening comments to Ratley, warning Ratley that he would get him removed from his canteen position and telling Ratley that his "days are numbered." Id. According to Ratley, around 7:30 a.m. on September 16, 2019, while Ratley was taking the trash out, two inmates hit him in the back of the head, knocking him unconscious. Id. He asserts that when he woke up, he was inside his assigned canteen and Burkett was "stomp[ing]" and "kicking" him. Id. During Burkett's assault, Ratley noticed that his canteen had been destroyed. Id. Burkett told Ratley, "clean up your store and act like nothing happened . . . ." Id. at 13-14. Ratley alleges that Burkett then allowed the two inmates who initially hit Ratley to take two canteen bags worth of inventory from the store before leaving. Id. at 14. Ratley asserts he then cleaned up the mess and continued his workday "even though [he] was in an extreme amount of pain due to being in fear of [his] life." Id.

According to Ratley, the next day, Ms. Phillips, the inmate canteen servicer, arrived with the weekly delivery and advised Ratley that if he did not replace the canteen's missing products, she would issue a disciplinary report

4

for the shortage. Id. Ratley alleges that officials then charged him with "Bartering with Other Inmates," because one of the two inmates who attacked him and stole from the canteen used a third inmate's ID card to take the items. Id. at 15-16.

On September 18, 2019, Ratley met with Ms. Troy, a library supervisor, about changing jobs and showed her his injured arm, "which was extremely swollen and bruised from [his] right shoulder down to [his] fingers." Id. at 14-15. Ratley maintains Troy immediately sent him to medical where Nurse Lee ordered x-rays, issued medical passes, provided ibuprofen, and told him that his bicep appeared torn. Id. at 15. Thereafter, according to Ratley, every day between September 20 and 24, 2019, he asked to see medical due to his arm injury and the extreme pain he was experiencing. Id. at 16-17. During that timeframe, Lee authorized a Solu-Medrol (a steroid shot for pain and swelling), ibuprofen, and Tylenol. Id. at 8, 16. Ratley also contacted his sister, Brandy Parrish, about his extreme pain and Parrish called medical to request a welfare check. Id. at 16. After the phone call, medical saw Ratley on September 22 and 23, 2019, and provided him Tylenol, ibuprofen, and a right-arm sling. Id. at 16-17; Doc. 28-1 at 4.

Medical took an x-ray of Ratley's right shoulder on September 25, 2019, which showed "markedly comminuted fracture displacement of the humeral/head with markedly displaced greater tuberosity with oblique

fracture through the proximal humerus." AC at 17. Ratley then signed a consultation form for a transfer to Reception and Medical Center (RMC) for an orthopedic consult. Id. at 17-18. Ratley contends he later attempted to declare two other medical emergencies, but both times medical responded that nothing more could be done until the orthopedic consult and advised him to stop complaining to his family as Parrish and his mother, Cindy Ratley, were calling the facility to report the injury each day. Id. at 18.

Officials transported Ratley to RMC on September 27, 2019, where orthopedic surgeons Drs. Winters and Ryan examined him. Id. After two additional x-rays, the doctors told Ratley he needed emergency surgery to repair the right shoulder. Id. The surgery had to be rescheduled because "the proper surgical parts were not on site," prompting Ratley to submit a grievance to the Secretary on September 29, 2019. Id. at 18-19; Doc. 28-1 at 4-5 (complaining in a grievance to the FDOC Secretary about a 13-day delay and that the surgeon did not have "enough parts" to complete the surgery, so the FDOC returned him to Hamilton C.I.'s general population). When Parrish later visited Ratley, he updated her about his situation, causing Parrish to then file two complaints on the FDOC website about the attack and Ratley's lack of adequate medical care following the attack. AC at 19-20. The FDOC then responded to only one of the complaints, advising Parrish that her complaint

about Burkett's attack would be forwarded to the Office of the Inspector General (OIG). Id. at 20.

Ratley continued to seek medical care for his arm injury and saw medical on September 30, 2019. Id. at 20-21. During that exam, Ratley asked medical if he could remove his shirt, so they could see the extent of his injury (which included a more recent injury caused by his cellmate stepping on Ratley's broken arm). Id. Dr. Colombani then ordered shots for Ratley's pain and bruising and upgraded his surgery request from urgent to emergent. Id. at 21. Dr. Colombani, however, denied Ratley's requests to be "placed in the infirmary due to not being able to protect [himself] f[ro]m harm." Id. at 20. According to Ratley, that same day he filed another formal grievance with the Secretary about the lack of adequate medical care. Id. at 21.

Ratley maintains that on October 1, 2019, at the request of Defendant Stewart, Lieutenant Harrell advised Ratley that even though officials knew that Burkett had attacked him and broken his arm, Ratley would remain at Hamilton C.I. and would not be placed in protective custody despite Ratley's "fear of retaliation" from Burkett. Id. at 9, 21. On October 2, 3, and 8, 2019, Parrish and the OIG exchanged emails about the assault investigation. Id. at 22. During that time, medical advised Parrish that Ratley's surgery was approved. Id. On October 11, 2019, Parrish emailed Defendant Palmer and the FDOC Central Office about the inadequate medical treatment and "lack of

transparency regarding the investigation." <u>Id.</u> Ratley's mother also contacted
classification officer Ms. Hunter and Captain James to confirm they knew
about Burkett's assault and Ratley's lack of medical care. <u>Id.</u>

According to Ratley, between October 15 and 19, 2019, he proceeded to
file several grievances with the Warden of Hamilton C.I. and the Secretary
about his need for medical care and Burkett's assault. <u>Id.</u> at 23; <u>see also</u> Doc.
28-1 at 2, 9, 11, 14. Ratley explains these grievances were either denied or
returned for non-compliance. AC at 23. Medical examined him during a sick-
call on October 16, 2019, and prescribed Tylenol after documenting that Ratley
had an elevated pulse and high blood pressure due to "the extreme pain." <u>Id.</u>
Parrish spoke with Ms. Gaylord, an employee of the OIG, on October 21, 2019,
who advised that Ratley's emergency surgery was approved but also had no
update on the assault investigation. <u>Id.</u>

On October 23, 2019, officials transferred Ratley to CFRC in preparation
for surgery at the Orlando Outpatient Surgical center and gave him medication
to lower his heartrate. <u>Id.</u> at 24. But once he arrived at the hospital, medical
staff had to reschedule the procedure because the elevators were broken. <u>Id.</u>
Officials returned Ratley to CFRC where he remained housed until his surgery.
<u>Id.</u> Ratley ultimately received right-shoulder open reduction internal fixation
(ORIF) surgery on November 4, 2019, during which doctors realigned his
socket and implanted a metal plate and screws into his arm and shoulder. <u>Id.</u>

8

at 25. The FDOC later returned him to CFRC, where he had a follow-up appointment with medical on November 12, 2019, and was provided ibuprofen and Tylenol. Id.

Officials transferred Ratley to RMC on November 14, 2019. Id. The next day, Drs. Winters and Ryan removed Ratley's stitches and advised that he would begin physical therapy soon. Id. at 26. That same month, Ratley sent grievances and requests to the OIG asking about its investigation. Id. Ratley alleges that in December 2019, he, Cindy Ratley, and Parrish proceeded to submit formal grievances to the Secretary about Burkett's assault and lack of pain medication following surgery. Id.; see Doc. 28-1 at 19, 23, 29.

Officials transferred Ratley back to Hamilton C.I. on December 13, 2019, and placed him in confinement pending the OIG's investigation. AC at 27. Ratley alleges, however, that Burkett and one of the two inmates who assaulted him were assigned to the same confinement unit. Id. That month, Parrish filed another complaint with the OIG and contacted the Regional Director's Office; and Ratley filed an emergency grievance with the Central Office about being housed at Hamilton C.I. with Burkett and a formal grievance with the Warden about the lack of medical care following his surgery. Id. Ratley asserts he also advised two prison officials, Major Carter and Sergeant Bowers, that he feared Burkett and needed protection, but they explained "protection couldn't be requested from an FD[O]C officer." Id. at 27-

9

28. According to Ratley, on December 24, 2019, Burkett came to Ratley's cell door and confronted him several times about the grievances and complaints he submitted about his assault. Id. at 28. He alleges Burkett made hostile comments, threatening retaliation and physical harm if Ratley did not drop the OIG investigation. Id. Ratley then wrote to the OIG, asking that the camera footage of Burkett making threats at his cell door be saved. Id. at 29. But on December 27, 2019, Major Carter and Ms. Hamlin recommended that Ratley be transferred "due to all of the allegations of assault and [his] arm and shoulder being broke," but explained he had a "Region 2 hold" and could not transfer to Suwannee or Columbia because family members worked at those facilities. Id.

On January 2, 2020, Ratley began right-shoulder physical therapy. Id. at 29. A few days later, Ratley advised his physical therapist that he was experiencing pain in his left shoulder too. Id. In March, April, and June 2020, Ratley saw a primary care physician, an orthopedic surgeon, and a nurse about his left shoulder pain. Id. at 30. He received injections for the pain and swelling and an x-ray of his left shoulder showed an "impacted anterior glenohumeral joint dislocation." Id. An orthopedic surgeon conducted a left shoulder ORIF surgery on June 5, 2020. Id. At his June 19, 2020 follow-up, the orthopedic surgeon referred Ratley to another surgeon for a "double reversal total shoulder replacement due to Hill-Sachs Impaction Fracture." Id.

Ratley asserts he continued to have left and right shoulder pain from June through December 2020. Id. at 30-33. On December 28, 2020, an orthopedic surgeon performed a "double reversal total shoulder replacement of" Ratley's left shoulder. AC at 30-33. Thereafter, in February 2021, Ratley submitted several sick-call requests and a grievance with CFRC's Warden about his need for post-surgery medical care. Doc. 28-1 at 54-66; AC at 32-33. He continued to submit sick-call requests and grievances about his right shoulder pain in March, May, June, July, and August 2021. AC at 34-35. And at some point, officials transferred him to Taylor C.I. where he submitted a grievance to Taylor C.I.'s Assistant Warden on July 16, 2021. Doc. 28-1 at 70. Ratley maintains that he suffered unnecessary delays related to the provision of medical care.

Based on these facts, Ratley alleges Defendants Dixon, in his official and individual capacities as the Secretary of the FDOC;[5] Palmer, in his individual and official capacities as FDOC's Regional Director of Region II; Young, in his individual and official capacities as Hamilton C.I.'s Warden; and Stewart, in his individual and official capacities as Hamilton C.I.'s Assistant Warden,

---

[5] Although Ratley only checked "official capacity" under Defendant Dixon on the Amended Complaint form, he alleges personal involvement by the Secretary and he seeks monetary damages, thus suggesting his intention that Dixon be sued in his individual capacity as well. Additionally, FDOC Defendants raise qualified immunity as an affirmative defense, see Motion at 19, which is only applicable to individual capacity suits. Thus, the Court construes Ratley's claims as being against all Defendants in their individual and official capacities.

violated his Eighth Amendment rights before and after Burkett's September 16, 2019 assault, as well as during the Medical Defendants' subsequent inadequate medical care. Id. at 4. He asserts that after Burkett's physical attack, FDOC Defendants failed to "remov[e] [him] from harm and [ ] correct[] the medical concern, which was so blatantly obvious [and] within the scope and requirement of their employment . . . ." Id. at 9. He asserts he notified Dixon, Palmer, Young, and Stewart about his need for protection from Burkett and medical care via the "grievance procedure, word of mouth, and family through the online complaint forum and telephone . . . ." Id. Ratley also alleges "the abuse by staff and the unlawful medical treatment [were] well known at the time" and "[t]he practice of inmate abuse was so blatant and wide-spread that it was common practice to allow the same officer[s] who blatantly abused inmates to remain on the compound and continue the violations." Id. at 8-9. As relief, he seeks monetary damages and asks that the Court direct the FDOC to train its staff and provide proper medical care.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,

12

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[6] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381

---

[6] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of Parties' Arguments

In their Motion, the FDOC Defendants argue they are entitled to summary judgment because they cannot be held vicariously liable under a theory of respondeat superior. <u>See generally</u> Motion. They assert there is no record evidence showing they failed to protect Ratley before or after Burkett's assault; and there is no evidence showing that they denied Ratley medical treatment following the assault. <u>See generally</u> Motion. They also argue they are entitled to qualified immunity.[7] <u>See</u> <u>id.</u> at 19-21. In response, Ratley argues the FDOC Defendants are not entitled to summary judgment because: each Defendant had personal knowledge that "inmates were being repeatedly assaulted by staff and not being adequately treated for their medical issues"; they knew about Burkett's assault and that Ratley did not receive proper medical care for his serious injuries afterward; and their implementation of an unofficial policy or practice of allowing FDOC staff to use malicious force on inmates and inadequately treat subsequent injuries forecloses an entitlement to qualified immunity. <u>See generally</u> Response Brief.

---

[7] Because the Court finds the FDOC Defendants did not commit any constitutional violations, the Court need not address the qualified immunity argument. Further, the Court need not address Ratley's official capacity claims.

## V. Evidence

During Ratley's deposition, he testified that on September 12, 2019, former FDOC correctional officer Ethan Burkett came to his canteen and demanded that Ratley give him and two other inmates items without payment. Doc. 128-1 at 10, 13. When Ratley said no, Burkett threatened that he would "replace" Ratley with an inmate who would provide him with free items. Id. at 14. Ratley stated that on that day, Burkett "never physically touched [him] or anything of that nature." Id. at 15. Instead, according to Ratley, Burkett finished his shift and three days later, on September 16, 2019, when Ratley was taking out the trash, two unknown inmates hit him on the back of the head. Id. at 11. Ratley testified he blacked out and when he woke up, the two inmates and Burkett had dragged him into his assigned canteen and Burkett was "stomping down on [his] right shoulder." Id. at 12, 15. He explained that when Burkett was done kicking him, he told Ratley to clean up the store and continue his day as if nothing happened and allowed the other two inmates to steal items from the canteen. Id. at 15. Ratley then cleaned up and "ran [his] canteen for that day." Id. at 16.

Ratley testified that during the days that followed, he interacted with multiple people but told no one about Burkett's attack. Id. at 15-18. He explained he spoke with his canteen operator on September 17; he met with the library supervisor and medical on September 18; he attended a disciplinary

hearing on September 19; he saw medical again on September 20, 22, 24, and 25; and on September 27, Drs. Winters and Ryan examined and x-rayed his right shoulder at RMC. Id. at 15-29. But Ratley admitted he told no one about Burkett's attack during any of those interactions. Id. at 15-29. On September 19, 2019, Ratley also emailed his sister, Brandy Parrish, but did not mention Burkett's attack and instead stated he "fell in [his] store . . . and [his] right arm is a swollen and purple mass from [his] elbow to [his] shoulder." Doc. 128-5.

According to Ratley, the first time he told anyone about Burkett's attack was on September 28, 2019, when he told his sister Parrish during their face-to-face visitation. Doc. 128-1 at 18, 29. He stated that at that time, he informed Parrish "of the entire situation and exactly what happened and [his] reasons for not saying what happened over e-mail." Id. at 29-30. Parrish immediately attempted to talk to the officer present during the visitation, but the officer told her "she would have to report it to the proper authorities." Id. at 30. Ratley stated that Parrish then filed two complaints on the FDOC website on September 29. Id. Ratley testified that two days later, on October 1, Lieutenant Harrell met with him in response to Parrish's complaint about staff abuse, took a photo of Ratley, and asked Ratley to write a statement about the incident. Id. at 31. Ratley explained that during that meeting, he asked Harrell if he could be placed in protective custody away from Burkett, but Harrell denied

17

the request, saying he "cannot ask for protection from an FD[O]C staff member." Id. at 33. According to Ratley, he asked to be placed in protective custody because during the assault, Burkett "made it clear that [Ratley] would not continue to live on the compound with him if [Ratley] told on him for" the attack. Id. Ratley acknowledged, however, that following the attack, he did not see Burkett again until after he returned to Hamilton C.I. following his first shoulder surgery. Id. at 33-34.

Ratley testified that on October 2, 3, and 8, Parrish exchanged emails with the OIG and the OIG informed her that the department was reviewing her complaint about the assault. Id. at 34-35. According to Ratley, on October 11, Parrish emailed Defendant Palmer's FDOC email "directly" and asked about the assault investigation and Ratley's need for medical care. Id. at 35-37. Ratley testified that Parrish obtained Palmer's direct FDOC email address because it is available online, but he did not know if Palmer personally responded to her email. Id. at 35-37. Ratley also stated that on October 11, his mother, Cindy Ratley, called his classification officer and Captain James to tell them about the assault. Id. at 37.

Ratley testified that on October 15, he began filing a series of informal and formal grievances about his need for medical care for the injuries he suffered during Burkett's assault. Id. at 38-42. On October 19, Ratley filed a grievance about Burkett's assault, and C. Neel responded to the grievance,

explaining "the subject of [his] grievance was previously referred to the [OIG]
. . . [a]nd since that process was initiated prior to receipt of the grievance, this
office cannot do anything." Id. at 43-44.

On October 23, 2019, officials transferred Ratley to CFRC for right-
shoulder surgery. Id. at 45-46. He remained at CFRC until he received his first
surgery, and officials then transferred him to RMC on November 14, 2019, for
follow-up care. Id. at 48-49. Ratley submitted an informal grievance to the OIG
about its investigation into Burkett's assault; and the OIG responded that the
assault was no longer an active OIG investigation and that it forwarded the
complaint (MINS-954546) to Hamilton C.I. officials. Id. at 49-50. A review of
the MINS Incident Report – 954546 shows that on September 18, 2019, Ratley
declared a medical emergency because of swelling in his right shoulder and
during his evaluation, he advised medical that he slipped and fell causing the
injury to his arm. Doc. 128-7 at 1. The MINS Report adds that Brandy Parrish
later emailed Colonel Brannen and alleged that Burkett verbally threatened
Ratley and that is the reason other inmates injured Ratley. Id. Ratley then
submitted a witness statement stating Burkett conspired to have "him beat
up," and then he attacked him on September 16. Id. at 2.

Ratley testified that on December 2, he filed a formal grievance with the
Secretary; and on December 13, A. Keaton responded saying the grievance was
being returned without action because he could not "appeal a decision that's

19

already rendered by the Office of the Secretary." Doc. 128-1 at 50. He also stated that his mother and Parrish submitted complaints about the assault via the FDOC website on December 5 and 12. Id. at 51.

On December 13, 2019, officials transferred Ratley back to Hamilton C.I. and placed him in confinement "due to the investigation." Id. at 51-52. On December 15, Ratley saw Burkett for the first time since the September 16 assault and learned Burkett was assigned to monitor the confinement unit in which Ratley was housed. Id. at 52-53. The next day, December 16, Ratley filed an emergency grievance with the Secretary's Office, asking for "an emergency transfer." Id. at 54. In the grievance, he advised officials that he felt his "life was in danger" because he was transferred back to the facility where Burkett attacked him and was confined in the unit to which Burkett was assigned. Id. at 53-54. Ratley testified that A. Johns responded, advising Ratley that his grievance was not accepted "as a grievance of an emergency nature, and that, once again, it was previously referred to the [OIG] and it's their responsibility to determine what's going to happen." Id. at 54.

Ratley testified that on December 20, Sergeant Bowers pulled Ratley from his cell and asked about his return to Hamilton C.I. and his protective custody status. Id. at 56. Ratley advised Bowers that he was in protective custody because of "the investigation" and explained he "was in fear of [his] life from Sergeant Burkett." Id. Bowers responded to Ratley that he could not

"request a keep-away from [an FDOC] staff member." Id. at 56. On December 21, Ratley's mother filed another complaint with the OIG about being returned to Hamilton C.I. and placed in Burkett's confinement unit. Id. at 57. Two days later, on December 23, officials escorted Ratley to Major Carter's office where Carter advised Ratley he had been placed in confinement because "upon intake, classification thought [he] was in fear of an inmate[,] not a staff member." Id. Ratley explained he advised Carter that he feared no other inmates, but rather he feared Burkett. Id. Carter told Ratley that while he could not request protection from a staff member, officials would review his custody status and determine if Ratley should be transferred to another facility. Id. at 58.

According to Ratley, on December 24, Burkett came to his cell several times and threatened retaliation if Ratley did not drop the investigation. Id. at 59. Thereafter, on December 27, ICP advised Ratley that they had recommended him for a transfer, and "sometime [during] the first week of January" 2020, officials transferred Ratley to another facility. Id. at 60-62. According to Ratley, after his January 2020 transfer, he has not returned to Hamilton C.I. Id. at 71.

Ratley testified that he named FDOC Defendants (the Secretary, Warden, Assistant Warden, and Regional Director) because it "was common knowledge" that "Burkett beats inmates." Id. at 71-72. Ratley stated FDOC

Defendants "would have to know" because the Florida Department of Law
Enforcement (FDLE) previously investigated Burkett for another inmate
assault, which resulted in other correctional officers being arrested and
criminally charged. Id. at 73. While Ratley could not provide details of other
inmate assaults involving Burkett, he stated he knew about Burkett's prior
attacks through "inmate speak." Id. When asked why he named the Secretary
as a Defendant, Ratley stated he sued him because he is the head of the FDOC.
Id. at 74. Ratley admitted he neither had information indicating that the
Secretary was personally involved in the events underlying this case, nor that
he or his family members spoke to the Secretary personally about the events.
Id.

    In his deposition, however, Ratley testified that his sister and mother
spoke with the Regional Director, the Warden, and the Assistant Warden and
informed them about Burkett's September 16, 2019 assault and asked why
officials continued to house him at Hamilton C.I. while Burkett was there. Id.
Ratley also stated that the Warden and Assistant Warden learned of the
situation because his family called Hamilton C.I. multiple times; Lieutenant
Harrell advised Ratley he planned to turn over relevant documents to
Hamilton C.I.'s Warden and Assistant Warden following their October 1, 2019
interaction; and Major Carter obtained documents from the Assistant
Warden's Office for their December 23 meeting about being transferred. Id. at

74-76. He also testified that his sister emailed Defendant Palmer several times, but he was unaware of whether Palmer ever responded to her emails. Id. at 75-76. Ratley acknowledged that following his transfer back to Hamilton C.I. after his surgery, he personally never spoke to the Warden or Assistant Warden, only his family members did. Id. at 77-78.

Defendant Palmer submitted a declaration, in which he states in pertinent part:

> My duties, as Regional Director in Region II are to provide supervisory oversight for the region . . . .
>
> Because we receive so much communication daily, I have a team of staff who assist me with delegation of duties, especially as it relates to tasking out correspondence and tracking responses. . . .
>
> It is common practice to ask that the administration at the location of custody to have the inmate evaluated by medical if the inmate was alleging denied access to care.
>
> Our records were searched to obtain any information we had related to this case. The records reveal that my secretary received and handled a call from the sister of Plaintiff, Brandy Parrish. She then emailed the Warden's Office at Hamilton CI and instructed them to give her a call at once . . . to address her concerns and then inform her of the outcome.

Doc. 128-2. The FDOC Defendants also submitted a copy of a December 23, 2019 email Defendant Palmer's Executive Secretary sent to Defendant Young,

stating that Parrish had called Palmer's office and asking that Defendant Young call Parrish to address her concerns. Doc. 128-6.

Defendant Young submitted a declaration that states the following in relevant part:

> As [former] Warden [at Hamilton C.I.], I was responsible for day-to-day administration and operations of the Correctional facility. Those duties included the oversight of employees, and correctional officers. I would respond to grievances from inmates.
>
> . . . .
>
> I did not have any direct contact with the Plaintiff Michael Steven Ratley . . . regarding the allegations of his complaint.
>
> I was not in a position to deny Plaintiff medical care, such requests for medical care would have been [to] nurses or corrections officers in the wing.
>
> In regard to the receipt of telephonic calls, as Warden, I had an assistant that fielded such calls for me.

Doc. 128-3.

Defendant Stewart submitted a declaration stating the following:

> As an Assistant Warden [at Hamilton C.I.,] I was responsible for day-to-day operations, the oversight of employees, and correctional officers. I would respond to grievances from inmates.
>
> I had a colonel who worked under me, as well as two or three Majors, who assisted me with resolving grievances and other inmate issues.

24

> I did not have any direct contact with Inmate Ratley
> regarding the allegations of his complaint.
>
> I was not in a position to deny Inmate Ratley medical
> care, such requests for medical care would have been
> [to] nurses or corrections officers in the wing.

Doc. 128-4.

## VI. Law and Conclusions

Ratley seeks relief against the FDOC Defendants based on a theory of supervisory liability because as "management of the institution," the FDOC Defendants had the means, responsibility, and authority to properly resolve the issues. Response Brief at 9. The FDOC Defendants argue that Ratley failed to submit evidence of their personal involvement sufficient to support his claims against them.

The Eleventh Circuit has held that "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). To establish individual liability for supervisory conduct, a plaintiff must show "that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and

25

the alleged constitutional violation." <u>Keith v. DeKalb Cnty.</u>, 749 F.3d 1034, 1047–48 (11th Cir. 2014).

A plaintiff may show the requisite causal connection in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [or she] fails to do so"; (2) "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinate would act unlawfully and failed to stop them from doing so." <u>Cottone</u>, 326 F.3d at 1360. Also,

> [T]o prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents, or multiple reports of prior misconduct by a particular employee. And allegations of a single incident of unconstitutional conduct cannot state a claim for supervisory liability, even when the conduct involves several subordinates.

<u>Ingram v. Kubik</u>, 30 F.4th 1241, 1254 (11th Cir. 2022) (internal quotations and citations omitted).

## A. Failure to Protect

The FDOC Defendants argue they are entitled to summary judgment on Ratley's failure to protect claims against them because he fails to establish that they violated his constitutional rights. Motion at 15-19. According to the FDOC Defendants, Ratley fails to point to any evidence showing they knew Burkett

posed an excessive risk to Ratley's health or safety before the incident or had the ability to remedy the situation beforehand. Id. They acknowledge that Ratley's family members contacted FDOC officials after the attack, but Ratley's original story was that his injuries resulted from a fall; and his subsequent decision to alter his story and report Burkett's actions could not place FDOC Defendants on notice. Id. They also contend that while Ratley filed grievances about the assault and his desire that officials offer him protection from Burkett following the assault, none of the FDOC Defendants personally responded to those grievances. Id.

Ratley contends the FDOC Defendants "had personal knowledge that Defendant Burkett had previously had allegations of inmate abuse, which were reported and [yet] continued to allow Defendant Burkett around the inmate population with the personal knowledge that the inmate population was at a greater risk of harm due to the actions of [D]efendant Burkett." Doc. 150 at 8. He also asserts he filed several grievances with the Warden and the Secretary personally informing them of Burkett's September 16, 2019 assault, and Parrish personally emailed Defendant Palmer about "the ongoing situation." Id. at 4-6. Ratley also alleges Parrish and his mother Cindy Ratley "notified via email, grievance, phone, online complaint or letter at a minimum (33) Thirty-three FD[O]C . . . employees of the assault," including Palmer, Stewart, and Young, about Ratley being housed in the same confinement wing that

27

Burkett was assigned to monitor, and about Ratley's desire for protection from Burkett. Id. at 7. Thus, Ratley maintains that a genuine dispute of material fact exists as to the FDOC Defendants' knowledge of the risk of harm Defendant Burkett posed to Ratley prior to and after the September 16, 2019 assault and that they failed to alleviate those risks. See Doc. 152.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," Farmer v. Brennan, 511 U.S. 825, 832 (1994), but this does not make them "guarantor[s] of [prisoners'] safety," Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005). As such, prison officials are not constitutionally liable for every inmate attack. Farmer, 511 U.S. at 832. Instead, it is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Id. at 828 (citations omitted). The Eleventh Circuit has explained the requirement of deliberate indifference to a substantial risk of serious harm as follows:

> To succeed on a failure-to-protect claim, a plaintiff must satisfy three elements. First, the plaintiff must show that [he] was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. Second, the plaintiff must show that the "prison official [had] a sufficiently culpable state of mind," amounting to "deliberate indifference." Id. (internal quotation marks omitted). Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused

28

[his] injuries. <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099 (11th Cir. 2014).

<u>Cox v. Nobles</u>, 15 F.4th 1350, 1357–58 (11th Cir. 2021) (citations modified).

Recently, the Eleventh Circuit clarified that in accordance with <u>Farmer</u>, courts in this circuit should apply the "subjective recklessness" standard as used in criminal law when determining liability on an Eighth Amendment deliberate indifference claim. See <u>Wade v. McDade</u>, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc). To satisfy this standard, the plaintiff must show:

> First . . . as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'" [<u>Farmer</u>, 511 U.S. at 834].

> Second, . . . that the defendant acted with "subjective recklessness as used in the criminal law," <u>id.</u> at 839, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." <u>Id.</u> at 844–45.

<u>Wade</u>, 106 F.4th at 1262 (enumeration and emphasis omitted).[8]

Under this standard, "liability requires consciousness of a risk." <u>Farmer</u>, 511 U.S. at 840. The defendant prison official "must both be aware of facts from

---

[8] The Court notes that the Honorable Adalberto Jordan wrote a concurrence to the majority's opinion in <u>Wade</u>, finding that to the extent prior Eleventh Circuit deliberate indifference cases are <u>not</u> inconsistent with <u>Wade</u>, "they should continue to be cited as binding precedent." <u>Wade</u>, 106 F.4th at 1265 (Jordan, J., concurring).

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. As such, a prisoner-plaintiff must point to evidence showing "the defendant prison official actually knew of a substantial risk of serious harm, not just that he should have known." Wade, 106 F.4th at 1257 (emphasis in original). A prison official cannot be held liable under the Eighth Amendment for not appreciating that a prisoner faced a substantial risk of serious harm, even if "the risk was obvious and a reasonable prison official would have noticed it." Farmer, 511 U.S. at 842 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

To establish an Eighth Amendment violation, a prisoner must point to evidence permitting the reasonable inference that the defendant was deliberately indifferent to conditions that were "sufficiently serious." See Chandler v. Crosby, 379 F.3d 1278, 1288 (11th Cir. 2004). Conditions of confinement are "sufficiently serious" only if they are so extreme that they expose the prisoner to "an unreasonable risk of serious damage to his future health or safety." Id. at 1289 (internal quotation marks omitted). "Showing a substantial risk of serious harm requires the prisoner to provide evidence that there was a 'strong likelihood' of his injury occurring." Visage v. Woodall, 798 F. App'x 406, 408 (11th Cir. 2020) (citing Brooks v. Warden, 800 F.3d 1295,

1301 (11th Cir. 2015)). A court's consideration of whether there was a strong likelihood, as opposed to a "mere possibility," of an injury occurring cannot be based on "hindsight bias." Brooks, 800 F.3d at 1301. Moreover, isolated incidents do not satisfy the "substantial risk" standard articulated in Farmer. See, e.g., Purcell, 400 F.3d at 1320 ("[O]ccasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable."); see also Lakin v. Barnhart, 758 F.3d 66, 70–72 (1st Cir. 2014) (Souter, J., sitting by designation) (explaining that the risk must be "substantial," not isolated or infrequent, and affirming summary judgment in defendants' favor where plaintiff's evidence did not reach the "substantial" threshold required by Farmer as "not every risk carries an inherent threat at a substantial level"). As such, a prisoner cannot survive summary judgment based solely on evidence of past isolated incidents or his own injury. Visage, 798 F. App'x at 408. Rather, the prisoner must demonstrate that the complained-of condition—most commonly inmate-on-inmate violence—resulted in so many incidents or injuries that such incidents or injuries were "the norm or something close to it." Marbury v. Warden, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting Purcell, 400 F.3d at 1322)).

Here, Ratley's Eighth Amendment failure to protect claim is seemingly based on two theories: (1) the FDOC Defendants failed to protect him from

Burkett's September 16, 2019 assault; and (2) the FDOC Defendants acted deliberately indifferent and failed to protect him from another potential assault when, after the September 16, 2019 assault, they ignored his requests for protection and continued to house him at Hamilton C.I.

As to both theories, the FDOC Defendants assert they were unaware of any underlying facts suggesting Burkett posed a substantial danger to Ratley. While the evidence shows that four days before the attack, Burkett made threatening comments to Ratley, Ratley does not allege, and no evidence shows, that Ratley advised any FDOC Defendant or any other official about Burkett's September 12, 2019 comments. Indeed, Ratley does not allege, and no evidence shows, that Ratley advised any FDOC Defendant or any other official that he feared Burkett prior to the September 16 attack. Ratley argues that the FDOC Defendants knew that Burkett posed a substantial risk to him prior to the September 16 attack because Burkett had a history of attacking inmates and that the FDOC had an unofficial policy or practice of allowing FDOC staff to use malicious force on inmates. But the only record evidence supporting that notion is Ratley's generalized testimony that Burkett's abusive history was "common knowledge" and that he learned about Burkett's history though "inmate speak." Doc. 128-1 at 72-73. But the record here contains evidence about only one incident (Burkett's September 16, 2019 assault), and that evidence alone does not constitute evidence of widespread abuse such that

a jury could find that the FDOC Defendants were put on notice of an increased risk of harm to Ratley. Nor does it support a finding that the FDOC Defendants had an unofficial policy resulting in a constitutional violation.

Notably, Ratley's own allegations and testimony show that before the attack, even he was unaware that Burkett posed a substantial risk of harm to him. Ratley testified that while Burkett made verbal threats on September 12, 2019, Burkett did not physically touch Ratley on that day. Indeed, three days then went by without Ratley seeing Burkett. It was on September 16, 2019, while Ratley was unaware and simply taking out the morning trash, that two unknown inmates hit Ratley from behind and dragged him inside his canteen where Burkett began kicking him.

The evidence further shows that following the attack, Ratley waited twelve days to tell anyone about Burkett's September 16 assault despite having several opportunities to advise family members and officials. Indeed, the September 19, 2019 email Ratley sent to Parrish states he injured himself after falling in his canteen. See Doc. 128-5. And Ratley admits that despite seeing various officials and medical personnel between September 17 and 27, he told no one about Burkett's attack.

The record shows that on September 28, 2019, Ratley mentioned Burkett's attack for the first time during his visitation with Parrish. Thereafter, Ratley spoke with Lieutenant Harrell; Parrish emailed Palmer's

direct FDOC email address; and Ratley submitted a grievance about Burkett.

But Ratley acknowledged that he did not know if Palmer responded to

Parrish's email, and Ratley testified that C. Neel responded to his grievance.

Ratley was then transferred to CFRC for surgery on October 23, 2019. The

undisputed evidence shows that between the September 16 attack and the

October 23 transfer, Ratley did not see or interact with Burkett. Thus, there is

no direct or anecdotal evidence from which to infer that the FDOC Defendants

were aware of information that Burkett posed a risk to Ratley during that

timeframe.

As to Ratley's return to Hamilton C.I., the record shows that Ratley was

returned to Hamilton C.I. on December 13, 2019. He saw Burkett for the first

time since the assault on December 15, 2019. Ratley and his family then

notified officials about Ratley's need for protection. Ratley also filed an

emergency grievance, to which A. Johns responded, and Sergeant Bowers met

with Ratley and learned of his desire for protective custody. On December 23,

2019, Parrish called Palmer's office and Palmer's Executive Secretary emailed

Defendant Young about Parrish's complaints and asked Young to contact

Parrish and notify the Secretary's Office immediately afterward. See Doc. 128-

5. That same day, Major Carter met with Ratley and, according to Ratley's own

testimony, explained that officials believed Ratley was placed in confinement

upon his return to Hamilton C.I. because he feared another inmate. When

Ratley explained that it was Burkett he was in fear of, Carter advised that officials would review his custody status, and they ultimately transferred Ratley to another facility about a week later. Thus, there is no evidence from which to infer that upon learning of the potential risk Ratley's December 13, 2019 transfer back to Hamilton C.I. posed, the FDOC Defendants disregarded that known risk by failing to respond to it in a reasonable manner. While it was unfortunate that upon his return to Hamilton C.I. officials housed Ratley in the same wing as Burkett, once officials learned of the true alleged threat to Ratley, they took reasonable actions to remedy the situation and transferred Ratley to another facility within days. As such, the record evidence fails to support a finding that the FDOC Defendants either directly participated in any unconstitutional conduct, or that they were causally connected to the alleged constitutional violation. Thus, on this record, the FDOC Defendants are entitled to summary judgment and the Motion is due to be granted as to Ratley's failure to protect claims against them.

## B. Deliberate Indifference to Serious Medical Needs

The material facts relating to the FDOC Defendants' involvement in Ratley's medical care are undisputed. The parties agree that the FDOC Defendants are not medical providers and that any claim against the FDOC Defendants based on the lack of medical care he received following Burkett's September 19, 2019 attack is solely based on their status as supervisory

officials. But Ratley's supervisory medical claim against the FDOC Defendants hinges on a determination that at least one of the Medical Defendants actually violated Ratley's clearly established constitutional rights. <u>See</u> <u>Rooney v. Watson</u>, 101 F.3d 1378, 1381 (11th Cir. 1996) (finding no supervisory liability where there was no underlying violation of clearly established constitutional rights); <u>Knight ex rel. Kerr v. Miami-Dade Cnty.</u>, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."). Because the Court has already determined that the Medical Defendants did not act deliberately indifferent to Ratley's serious medical needs, <u>see</u> Order (Doc. 145), the FDOC Defendants cannot be liable in their supervisory roles. As such, the FDOC Defendants are entitled to summary judgment and the Motion is due to be granted as to Ratley's deliberate indifference to serious medical need claims against them.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     Defendants' Motion for Summary Judgment (Doc 127) is **GRANTED**.

2.     The **Clerk** shall terminate Defendants Dixon, Palmer, Stewart, and Young as parties.

3.    **By January 31, 2025**, Defendant Burkett and Ratley shall confer in good faith in an attempt to resolve the remaining claims. If they reach a settlement, they shall promptly notify the Court. If they cannot settle the claims privately, Defendant Burkett shall file a notice advising whether the parties believe a settlement conference with the United States Magistrate Judge will be beneficial.

4.    To allow the parties sufficient time to confer regarding settlement, the Clerk shall **administratively close** the case pending further order.

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of December, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7
C:    Michael Steven Ratley
        Counsel of record